The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader.  The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
November 5, 2020

**2020COA154**

**No. 19CA0328, *People in Interest of A.A.* — Juvenile Court —
Dependency and Neglect — Termination of the Parent-Child
Legal Relationship**

A division of the court of appeals holds that where the juvenile

court completely cuts off visitation between the parents and the

children, without any showing that entirely prohibiting such

visitation is necessary to protect the children, there have not been

reasonable efforts to reunify the family.  The division further notes a

potential conflict in the standard of review language found in two

supreme court cases — *Interest of S.N. v. S.N.*, 2014 CO 64, and

*People in Interest of C.A.K.*, 652 P.2d 603 (Colo. 1982) — and urges

the supreme court to clarify the standard to be applied in reviewing

termination of parental rights cases.

Court of Appeals No. 19CA0328
Adams County District Court No. 17JV209
Honorable Priscilla J. Loew, Judge

The People of the State of Colorado,

Appellee,

In the Interest of A.A. and E.A., Children,

and Concerning M.A. and J.A.,

Appellants.

JUDGMENT REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division VII
Opinion by JUDGE TOW
Navarro and Lipinsky, JJ., concur

Announced November 5, 2020

Heidi M. Miller, County Attorney, Deborah Kreshner, Assistant County
Attorney, Westminster, Colorado, for Appellee

Barry Meinster, Guardian Ad Litem

Antony Noble, Office of Respondent Parents' Counsel, Lakewood, Colorado, for
Appellant M.A.

The Saroyan Law Firm, L.L.C., Zaven T. Saroyan, Colorado Springs, Colorado,
for Appellant J.A.

¶ 1      Mother, J.A., and father, M.A., appeal the juvenile court's judgment terminating their parent-child legal relationships with A.A. and E.A.  We conclude that the Adams County Human Services Department (Department) did not exercise reasonable efforts to reunify the family.  In particular, we agree with both parents that the court completely cut off visitation, at the Department's recommendation, without a sufficient showing that a complete denial of visitation was appropriate under the circumstances.  In addition, we conclude that the Department did not exercise reasonable efforts to rehabilitate father.  We therefore reverse the judgment and remand the case for further proceedings.

## I.      Background

¶ 2      In June 2017, the Department filed a petition in dependency or neglect because of concerns that mother and father were using methamphetamine, engaging in domestic violence, and neglecting the children's basic and special educational needs.  At the time the petition was filed, one of the children was five years old and the other was seven years old.

¶ 3      A juvenile court magistrate adjudicated the children dependent or neglected and approved treatment plans for the

1

parents. Eighteen months later, the juvenile court terminated both parents' parental rights.

## II. Reasonable Efforts

¶ 4 Mother and father raise a number of challenges regarding the services that the Department provided to their family. The juvenile court made no explicit findings regarding whether the Department made reasonable efforts to rehabilitate the parents and reunite the family. Regardless, as discussed below, our review of the record reveals that the evidence was insufficient to support such a determination. Therefore, we agree with mother and father that the judgment must be reversed.

### A. Standard of Review and Legal Principles

¶ 5 One of the goals of the Children's Code is to preserve the parent-child relationship whenever possible. § 19-1-102(1)(b), C.R.S. 2019; *see also People in Interest of C.A.K.*, 652 P.2d 603, 610 (Colo. 1982). To that end, when the state has instituted dependency or neglect proceedings, it must make reasonable efforts to rehabilitate parents and reunite families following the out-of-home placement of abused or neglected children. §§ 19-1-103(89), 19-3-100.5, 19-3-604(2)(h), C.R.S. 2019.

"Reasonable efforts" means the exercise of diligence and care to reunify a parent with his or her children. § 19-1-103(89). The reasonable efforts standard requires each county to provide services to children who are in out-of-home placement and to their families in accordance with section 19-3-208, C.R.S. 2019. §§ 19-1-103(89), 19-3-100.5(5).

¶ 6 After adjudicating a child dependent or neglected, a juvenile court may terminate parental rights under section 19-3-604(1)(c) only if clear and convincing evidence establishes that (1) the parent has not complied with an appropriate, court-approved treatment plan or the plan was unsuccessful; (2) the parent is unfit; and (3) the parent's conduct or condition is unlikely to change within a reasonable time. In determining unfitness, the juvenile court must consider whether reasonable efforts by child-caring agencies have been unable to rehabilitate the parents. § 19-3-604(2)(h).

¶ 7 When reviewing a juvenile court's decision to terminate parental rights, appellate courts have long applied a very deferential standard, setting aside a termination only when the juvenile court's findings are "so clearly erroneous as to find no support in the record." *C.A.K.*, 652 P.2d at 613. "The credibility of the witnesses

and the sufficiency, probative value, and weight of the evidence, as well as the inferences and conclusions to be drawn from it, are within the discretion of the trial court." *K.D. v. People*, 139 P.3d 695, 702 (Colo. 2006) (citing *C.A.K.*, 652 P.2d at 612).

¶ 8　　However, our supreme court has also suggested that a different standard may be applicable. *People in Interest of S.N. v. S.N.*, 2014 CO 64 (*S.N. II*). In *S.N. II*, the juvenile court had entered summary judgment adjudicating the child dependent or neglected, concluding that there was no disputed issue of fact that the parents' care of the child presented a risk of prospective harm. *Id.* at ¶ 2; *see also People in Interest of S.N.*, 2013 COA 157, ¶ 5 (*S.N. I*), *rev'd*, 2014 CO 64. A division of the court of appeals reversed, holding that the issue of prospective harm involved disputed facts. *S.N. II*, ¶ 26.

¶ 9　　The supreme court reversed the division. In doing so, it held that prospective harm is not "purely a factual question." *Id.* at ¶ 21. Instead, the court stated that "[w]hether a child is dependent and neglected is a mixed question of fact and law because resolution of this issue necessitates application of the dependency and neglect statute to the evidentiary facts." *Id.* The court then

4

reiterated the distinction between evidentiary facts — i.e., "the raw, historical data underlying the controversy" — and the ultimate fact, which "involves a conclusion of law or at least a determination of a mixed question of law and fact [that] settles the rights and liabilities of the parties." *Id.* (quoting *Blaine v. Moffat Cty. Sch. Dist. Re No. 1*, 748 P.2d 1280, 1287 (Colo. 1988)).

¶ 10    We acknowledge that the *S.N.* case involved a different stage of a child protection proceeding — an adjudication — than the stage in this case — a termination. But there is no logical reason why the supreme court's dichotomy would not apply equally at the termination stage. *Cf. In Interest of Baby A*, 2015 CO 72, ¶ 16 (reviewing as a mixed question of fact and law the juvenile court's decision to terminate a biological father's parental rights in an adoption proceeding under section 19-5-105, C.R.S. 2019). The analytical underpinnings of *S.N. II* would apply with equal force to the distinction between "evidentiary facts" and the "ultimate facts" warranting a juvenile court's decision to terminate parental rights. Indeed, at least three divisions of this court appear to have applied *S.N. II* to the termination stage in a dependency or neglect case. *See People in Interest of S.R.N.J-S.*, 2020 COA 12, ¶ 10; *People in*

5

*Interest of S.K.*, 2019 COA 36, ¶ 41; *People in Interest of L.M.*, 2018 COA 57M, ¶ 17.

¶ 11 This change, if indeed it is a change, significantly alters this court's role in reviewing cases involving termination of parental rights. For example, if a trial court's findings *and conclusions* regarding a parent's fitness are reviewed as purely factual findings, they will "not be disturbed on review unless so clearly erroneous as to find no support in the record." *C.A.K.*, 652 P.2d at 613. This is an extremely deferential standard.[1] But if the fitness determination is, as the supreme court suggested in *S.N.*, a mixed question of fact and law, the resolution of the ultimate question — whether sufficient grounds for termination have been shown — is reviewed

---

[1] Indeed, it is difficult to reconcile this standard of review with the standard of proof to be applied by the juvenile court — clear and convincing evidence. Under this standard, we cannot disturb a juvenile court's conclusion that there was *clear and convincing evidence* that a parent was unfit so long as the record contains *any* evidence that the parent was unfit. *Contra McCoy v. People*, 2019 CO 44, ¶ 63 (In criminal cases, appellate courts review the record de novo to determine "whether the relevant evidence, both direct and circumstantial, when viewed as a whole and in the light most favorable to the prosecution, is substantial and sufficient to support a conclusion by a reasonable mind that the defendant is guilty of the charge beyond a reasonable doubt." (quoting *Clark v. People*, 232 P.3d 1287, 1291 (Colo. 2010))).

de novo. *See S.K.*, ¶ 41. In other words, though we would defer to the juvenile court's findings of historical fact, we would no longer be required to deferentially review the juvenile court's legal conclusion of unfitness.

¶ 12     And many of the findings and conclusions that go into a juvenile court's ultimate determination whether to terminate parental rights arguably fall in the "mixed question" bucket, in that they involve the "application of the dependency and neglect statute to the evidentiary facts." *S.N. II*, ¶ 21. For example, the determination of whether a parent is unfit requires the application of legal standards set forth in section 19-3-604. *See S.R.N.J-S.*, ¶ 11. Similarly, as relevant here, a juvenile court's conclusion that the government exercised reasonable efforts requires application of section 19-3-208 to the historical facts as found by the juvenile court. *See* § 19-1-103(89) (deeming the services enumerated in section 19-3-208 to meet the reasonable efforts standard); *cf. People in Interest of I.J.O.*, 2019 COA 151, ¶ 22 ("We recognize that we review a juvenile court's finding of reasonable efforts for clear error. Even so, we must review de novo whether the court applied the correct legal standard." (citing *S.N. II*, ¶ 21)).

7

¶ 13    In short, in the wake of the supreme court's decision in *S.N. II,* it is unclear whether we are to review the juvenile court's determination of reasonable efforts (implicit in this case) de novo or for clear error.  However, we conclude that we need not resolve this question because the juvenile court's decision here was erroneous under either standard.[2]

## B.    Visitation

¶ 14    Mother contends that the juvenile court violated her constitutional right to due process and her statutory right to visitation services when it denied her those services for reasons unrelated to the children's health, safety, or well-being.  Similarly, father asserts that the juvenile court erred by delegating decisions regarding visitation to the Department and guardian ad litem (GAL), with the result that he had extremely limited visitation with the

---

[2] That being said, these decisions involve critical, and often conflicting, interests: children's right to have their physical, mental, and emotional conditions and needs met, *see* § 19-3-604(3), C.R.S. 2019, and parents' fundamental liberty interest in the care, custody, and management of their children, *see Santosky v. Kramer*, 455 U.S. 745, 753 (1982).  Uncertainty regarding our role in reviewing juvenile court orders in these all-too-frequent cases potentially delays much needed permanency.  We respectfully urge the supreme court to provide clarity.

8

children.  The substance of both parents' arguments is that (1) they did not receive statutorily mandated visitation services and (2) the juvenile court consequently erred when it found that the Department made reasonable efforts to rehabilitate them and reunify the family.

¶ 15     Father also contends that the Department did not make reasonable efforts to "rehabilitate" the children by providing the services they needed to prepare for a successful reunification, including visitation with each other and with father.  In other words, he asserts that the Department did not make reasonable efforts to reunify the family.  *See* § 19-3-100.5 (the state must make reasonable efforts to reunify families); § 19-3-208(1), (2)(a)(IV) (the state shall provide services to children who are in out-of-home placement to facilitate reunification of parents and children).

¶ 16     We agree that the juvenile court reversibly erred when it (1) conditioned visitation services for mother and the children on mother's sobriety without a proper statutory basis and (2) found that the parents were unfit despite the Department's failure to meet

the reasonable efforts standard by providing adequate visitation services for the family.[3]

¶ 17 Visitation services for parents and children in out-of-home placement must be provided in accordance with individual case plans. § 19-3-208(2)(b)(IV). The child's health and safety are the paramount concerns in determining whether services, including visitation, are necessary and appropriate. *People in Interest of D.G.*, 140 P.3d 299, 302 (Colo. App. 2006). Visitation services shall be designed to promote the health, safety, and well-being of the children; facilitate the speedy reunification of parents and children; and promote the best interests of the child. § 19-3-208(2)(a).

### 1. Mother's Visitation

¶ 18 On June 22, 2017, the Department removed the children from the parents' home pursuant to an emergency order and placed them with a paternal great-aunt and great-uncle. At the shelter hearing five days later, the magistrate ordered the Department to provide

---

[3] Because we agree with mother's statutory argument, we need not reach her due process claim. *See, e.g., BS & C Enters., LLC v. Barnett*, 186 P.3d 128, 133 (Colo. App. 2008) (noting that the principle of judicial restraint counsels against unnecessarily deciding constitutional issues (citing *Developmental Pathways v. Ritter*, 178 P.3d 524, 535 (Colo. 2008))).

the family visitation at least twice per week. The Department was to supervise mother's visits, while the placement providers would supervise father's visits. The magistrate also ordered the GAL to schedule regular telephone calls for the family. The caseworker's report noted that mother was appropriately attached to the children, who described her as "the best mom."

¶ 19     On July 5, 2017, mother completed a mental health evaluation, in which she reported symptoms of depression and anxiety. She said the children were her reason to live and that she wanted to be a good mother.

¶ 20     On July 18, 2017, A.A. entered residential treatment after the great-aunt and great-uncle were unable to manage his behavior.

¶ 21     On July 21, 2017, the magistrate held a shelter hearing to address A.A.'s placement. The parents reported that they had been allowed only one telephone call with the children in the past month. Mother expressed frustration at being denied contact with A.A. while he was struggling because, in her experience, she could have a settling effect on A.A. and could help him get his behavior under control.

11

¶ 22    On July 26, 2017, mother reported that she was struggling emotionally because she had never been away from her children before.  She requested a set schedule for telephone calls, which the court ordered.  The Department reported that staff at the residential treatment facility were frequently placing A.A. in physical holds to manage his behavior.  There is no evidence that the Department had provided any in-person visitation for the family since the children's removal.

¶ 23    On August 15, 2017, A.A. was moved to a second residential treatment facility.

¶ 24    On September 26, 2017, a different magistrate held a permanency planning hearing.  The caseworker reported that mother had been uncooperative and defiant and both parents continued to use methamphetamine.  As a result, the Department asked the magistrate to suspend mother's visitation until she could demonstrate two weeks of monitored sobriety.  The GAL agreed with the request on the grounds that the parents' relationship *with each other* was toxic, as evidenced by emails between the parents, and their relationship created a terrible environment for the children.  But he did not explain how the parents' relationship with one

12

another affected the children, given that the children were placed out of the home and, as a result, there was no evidence that they were witnessing the parents' conflict.

¶ 25    The magistrate suspended visitation until each parent could demonstrate two weeks of sobriety through urinalysis testing. The magistrate reasoned there was no point in allowing visitation until the parents were sober because, until then, visitation would be more harmful to the children than helpful.

¶ 26    But the magistrate did not explain how he came to this conclusion. There was no evidence that either parent had attended a visit while intoxicated or that either parent had missed or disrupted a visit due to intoxication. Indeed, there was no evidence that either parent was allowed any in-person visits with the children.

¶ 27    Further, there was no evidence that a more moderate approach, such as sobriety testing immediately before visits, would not have sufficiently addressed any concerns about the parents' conduct during visitation without depriving the family of this fundamental service. Thus, it is unclear how the magistrate's visitation order was designed to promote the health, safety, and

well-being of the children; facilitate the speedy reunification of the family; or promote the best interests of the children. *See* § 19-3-208(2)(a).

¶ 28    At a review hearing in February 2018, mother's counsel asked the second magistrate to consider therapeutic visitation and offered to have mother complete an assessment, if necessary, to determine the appropriate level of supervision or intervention.  But after mother spoke out of turn, the magistrate denied the request, stating, "[T]here is the example of why she has no contact with the children.  She can't deal with it."  The magistrate did not explain, and we are unable to glean from the record, how mother's conduct in court related to her ability to have appropriate therapeutic visitation sessions with the children or how the continued denial of visitation services for mother and the children served the statutory goals of section 19-3-208(2)(a).

¶ 29    Given this record, we conclude that the magistrate erred when he suspended the parents' visitation entirely pending two weeks of demonstrated sobriety.

¶ 30    Further, the magistrate and the juvenile court did not ensure that the family was provided adequate visitation services.  Because

mother never established two consecutive weeks of clean urinalysis tests, the Department never offered visitation services for her and the children. As a result, mother and the children were totally deprived of the visitation services required by section 19-3-208(2)(h) without any showing that such total deprivation was necessary to protect the children. Thus, we further conclude that the juvenile court erred when it terminated mother's parental rights because the record does not support a determination that the Department made reasonable efforts to reunite mother with the children.

### 2. Father's Visitation with E.A.

¶ 31 Father met the sobriety requirement and resumed monitored visitation with the children. At a review hearing in November 2017, the caseworker reported that father was appropriate in visits with both children.

¶ 32 But at the termination hearing, the caseworker testified that father's visits with E.A. had been suspended again in January 2018. She said the Department had stopped offering visitation because E.A. perceived that father did not understand him, was disrespectful of E.A., and did not fit in with E.A.'s need to organize and control his environment.

¶ 33    Although the case continued for another year, father and E.A. had no more visits.  The second magistrate, and later the juvenile court, periodically reviewed the case and approved the Department's repeated recommendations to deny visitation because the visit in January had gone poorly.  In particular, the GAL explained that E.A. was upset because father had been "loud and boisterous" and had thrown E.A.'s Legos.  The caseworker reported that father had been "disrespectful toward [the] Legos."  Eventually, the GAL and the Department began to report that E.A. no longer wanted contact with his parents.

¶ 34    But there is no evidence in the record that the Department made any referrals for therapy or therapeutic visitation for father and E.A. to preserve and strengthen their family ties.  *See* § 19-1-102(1)(b).  And although the Department indicated in February 2018 that it planned to establish professionally supervised visitation at the Department's facilities, it failed to do so, without explanation.  Instead, the record establishes that, when visitation under the supervision of E.A.'s kinship placement provider became problematic, the Department withdrew all visitation services for father and E.A.  It is unclear why the

16

Department took this drastic step without making any effort to help father and E.A. repair their relationship or to determine whether any other level of visitation services would meet E.A.'s needs, such as professionally supervised or monitored visitation.

¶ 35    Therefore, we conclude that the record does not establish that the Department provided adequate visitation services for father and E.A. as required by section 19-3-604(2)(h).  As a result, we further conclude that the record does not support a determination that the Department made reasonable efforts to reunite father and E.A. Thus, the juvenile court erred when it terminated father's parent-child legal relationship with E.A.

### 3.    Father's Visitation with A.A.

¶ 36    Father contends that the juvenile court improperly delegated visitation decisions to the Department, the GAL, and A.A.'s therapists.  As a result, father asserts, he had only one visit with A.A. in the six months before the termination hearing concluded.

¶ 37    We decline to address this contention because, as discussed below, we reverse the judgment terminating father's parent-child legal relationship with A.A. on other grounds.

17

### 4. Visitation Between the Children

¶ 38 Father contends that the Department did not provide adequate visitation for the children with each other and that, as a result, they were not accustomed to each other enough to live together with father.

¶ 39 We agree that the Children's Code recognizes the importance of sibling relationships and requires the Department to promote frequent contact between siblings in foster care in accordance with the children's best interests. § 19-7-204, C.R.S. 2019. Nonetheless, we decline to review this contention because it did not form a basis for the court's termination decision.

### C. Substance Use Treatment Services for Father

¶ 40 Father contends that the juvenile court erred when it terminated his parental rights because the Department did not make reasonable efforts to rehabilitate him. We agree.

¶ 41 The Department moved to terminate parental rights on June 1, 2018. Father entered an inpatient substance use treatment program three days later and successfully complied with the program for over four months.

18

¶ 42     At the termination hearing, father testified that the inpatient program was designed to take two years, including eighteen months in the residential facility and six months in a halfway house.  But in September 2018, he said, the caseworker and the GAL told him that they planned to move forward with the termination motion because the children should not have to wait two years for him to finish the program.  Father testified that he then decided to move to a sober living facility so he could be available to parent the children.  He said that he had already completed over 400 hours of therapy, including dialectical behavioral therapy, cognitive behavioral therapy, anger management, and reality therapy, and he felt confident that he could maintain sobriety in a less restrictive environment.

¶ 43     The Department and the GAL argued that father's early departure from the inpatient program demonstrated his inability to address his substance use.  But father's counsel asserted that father faced an impossible choice: stay in the inpatient treatment program and be deemed unfit because he was not available to care for the children or leave the program and be deemed unfit because he had not completed the program.

¶ 44    We recognize that the juvenile court discredited father's testimony that he left the two-year program early to try to preserve his parental rights. Regardless, the record does not support a finding that the Department made reasonable efforts to rehabilitate father in light of the Department's decision not to offer him any other substance abuse treatment.

¶ 45    Father and the caseworker both testified at the termination hearing that the Department did not provide referrals or funding for father's substance abuse treatment services. Instead, father was left to locate and pay for these services on his own. It appears that the caseworker had decided that the only way father could comply with his treatment plan (which required that he receive substance abuse treatment) was to complete the two-year inpatient program. But it is unclear why nothing less than a two-year inpatient program would suffice to address father's substance use.

¶ 46    The caseworker testified at the termination hearing that she had spoken with father's therapist at the sober living facility in mid-October 2018 and was told that the facility staff was working to match the services father had received in the inpatient program. The caseworker said she did not speak with anyone at the sober

living facility again. Nevertheless, the Department objected that the sober living facility only provided substance abuse support and did not provide adequate substance abuse treatment. Yet the Department did not offer any referrals for programs that it considered adequate to comply with father's treatment plan. Instead, the caseworker testified at the termination hearing that she was unaware of any substance abuse treatment father had arranged or paid for *on his own.* (We note that the undisputed evidence shows that father had been sober for four months when he moved to the sober living facility and remained sober when the termination hearing ended three months later.)

¶ 47 Under these circumstances, we conclude that the record does not support a determination that the Department made reasonable efforts to rehabilitate father. On this independent basis, the juvenile court erred when it terminated father's parent-child legal relationships with both children.

### D. Mental Health Services for A.A.

¶ 48 Father contends that the juvenile court erred when it terminated his parent-child legal relationship with A.A. because the Department did not meet its obligation to make reasonable efforts

to reunify the family by providing necessary mental health services for A.A. We need not resolve this contention in light of our reversal on other grounds. However, because the issue of A.A.'s treatment will certainly arise on remand, we address the issues raised.

### 1. A.A.'s Placement History

¶ 49 A.A. and E.A. were removed from their parents' home on June 22, 2017, and placed with the great-aunt and great-uncle.

¶ 50 In July 2018, then-seven-year-old A.A. was placed in a residential treatment facility because the great-aunt and great-uncle were unable to manage his aggressive and violent behavior. The Department reported that staff at the residential treatment facility frequently placed A.A. in physical management holds to control his behavior.

¶ 51 In August 2018, A.A. moved to a second residential treatment facility, where he lived in a highly structured therapeutic environment for nearly nine months.

¶ 52 In February 2019, A.A.'s Court Appointed Special Advocate (CASA) reported that the treatment facility staff believed A.A. was ready to transition to the community, although the next move

would be extremely difficult. The GAL asked the court to authorize step-down placement for A.A., including continuing day treatment.

¶ 53 At a shelter hearing on May 3, 2018, the second magistrate placed A.A. with a paternal aunt and uncle. Father also resided in the home and had worked with A.A.'s treatment team to prepare for the transition so he could care for A.A. under the supervision of the aunt and uncle. But, contrary to the recommendations of A.A.'s treatment providers, the GAL, and the CASA, the Department reported that it had not arranged to provide continuing day treatment for A.A. because the public school district had not agreed to pay for it. The GAL reported that A.A. was not ready for the public school system.

¶ 54 The caseworker testified at the termination hearing that father argued with the aunt and uncle over father's use of alcohol two days after A.A. was placed in the home. She said the aunt and uncle asked father to leave, and he moved out two weeks later. (As discussed above, father entered the inpatient treatment program about two weeks after leaving the paternal aunt's home.)

¶ 55 The caseworker testified that, on May 25, 2018, the aunt took A.A. to a hospital emergency department and reported that he was

exhibiting suicidal behavior and had been violent toward her son. Over the next eleven weeks, A.A. changed placements six times, moving in and out of three different residential treatment facilities and emergency mental health hospitalizations at two different hospitals. The caseworker testified that, at the time of the termination hearing, A.A. was living at a residential treatment facility and was subject to physical management holds up to three times per day, four days per week, usually because he "was assaultive" to staff or other children.

### 2. A.A.'s Treatment Needs

¶ 56 A.A.'s individual therapist from the residential treatment facility gave the following testimony at the termination hearing regarding A.A.'s treatment needs for a successful transition to the aunt and uncle's home:

- A.A. had been diagnosed with post-traumatic stress disorder and attention deficit hyperactivity disorder.

- A.A. needed a lot of support to transition successfully to a home environment because he had spent so much time in the highly structured environment of the residential treatment facility.

- A.A.'s treatment team had recommended that A.A. begin day treatment at the residential treatment facility immediately as he transitioned to a family setting.

- The day treatment program would provide stability, a structured educational program, and therapeutic services.

- If day treatment was not available, A.A. would need individual and family therapeutic support.

- Father and A.A. had begun family therapy at the residential treatment facility as part of the transition plan. A.A.'s treatment team wanted this therapy to continue while A.A. adjusted to the home environment.

- A.A. did not begin day treatment because neither the school district nor the Department agreed to pay for it.

- The Department did not set up any other therapeutic services for A.A. before removing him from the residential treatment facility.

¶ 57 The caseworker gave the following testimony to explain why the Department had not provided these services:

- The school district in Denver, where the residential treatment facility was located, denied funding for A.A.'s day

treatment because A.A. would not be a Denver resident once he was placed with the aunt and uncle in Douglas County.

- The Department did not provide day treatment because the Denver school district did not agree to pay for it.

- Instead, the Department provided Key Essential Elements of Permanency services in the home to provide support and parenting skills for the placement providers, daily for the first week and then three times per week.

- The Department scheduled a meeting with A.A.'s new school in Douglas County to update his individualized education plan (IEP). The IEP then in effect identified only A.A.'s speech and language deficit and did not acknowledge his significant mental health and behavioral needs.

- The Department planned to ask the Douglas County school district to pay for day treatment at the IEP meeting.

- A.A. was hospitalized after three weeks and did not return to the paternal aunt's home, so the IEP meeting never took place.

¶ 58    Thus, the record establishes that the Department did not provide any of the therapeutic services that A.A.'s treatment providers said were necessary to ensure a successful transition to family life after nine months of residential care.

¶ 59    A.A. was undoubtedly affected by father's relapse and eviction from the aunt and uncle's home. But even without that disruption, A.A. was subjected to a slew of simultaneous transitions:

- he moved from the highly structured environment of a residential treatment facility, where he had lived for nine months, to a family setting;

- he lost contact with his mental health treatment providers and was not offered any other treatment;

- he was enrolled in a new school two weeks before the end of the school year; and

- all of his daily routines changed.

¶ 60    These events would have taxed any child. In the absence of adequate support, the disruptions' deleterious effect on a child with significant mental health diagnoses was not only predictable but predicted by the GAL, the CASA, and A.A.'s treatment providers at the residential treatment facility.

¶ 61     We recognize that section 19-3-208(2)(d)(IV) limits the Department's responsibility to provide mental health services based on the state's capacity to obtain funding.  But the Department does not argue on appeal that it was not required to provide these necessary services, and there is no evidence in the record that the Department was unable to secure funding.

¶ 62     On remand, the juvenile court must consider whether the Department's approach to addressing A.A.'s mental health needs is sufficient to meet the requirement that the Department exercise reasonable efforts to reunify the family.  Further, to the extent the Department asserts lack of funding for the services A.A. requires, the juvenile court must base any decision regarding such funding on evidence specifically related to the Department's efforts, if any, to secure funding for the needed services.

### III.     Remaining Issues

¶ 63     Both parents contend that termination of their parental rights was manifestly unjust to A.A. because he remained in residential care with no prospect of adoption.  Father also contends that (1) the Department did not make reasonable efforts to rehabilitate him because it did not provide domestic violence treatment as required

28

by his treatment plan; (2) the juvenile court erred when it found that he could not become fit within a reasonable time despite several months of demonstrated sobriety after he found treatment on his own; and (3) his trial counsel rendered ineffective assistance.

¶ 64 Because we reverse the termination judgment on other grounds, we need not address these contentions.

## IV. Conclusion

¶ 65 The judgment is reversed and the case is remanded to the juvenile court. On remand, before the court may again consider termination of the parents' parental rights, it shall review whether the existing treatment plans are appropriate or modify them as necessary and, consistent with this opinion, conduct further proceedings as the court deems warranted. *See People in Interest of N.F.*, 820 P.2d 1128, 1130 (Colo. App. 1991).

¶ 66 In implementing the existing treatment plans or adopting new plans, the juvenile court shall determine whether and under what conditions the Department must provide mother and father with visitation and therapeutic services as reasonable efforts under section 19-3-208. The juvenile court must make this determination based on the children's health and safety. *See D.G.*, 140 P.3d at

We express no opinion concerning the ultimate outcome that the juvenile court may reach on remand.

JUDGE NAVARRO and JUDGE LIPINSKY concur.