21CA0273 Peo in Interest of JRN 01-27-2022 COLORADO COURT OF APPEALS Court of Appeals No. 21CA0273 Douglas County District Court No. 19JV109 Honorable H. Clay Hurst, Judge The People of the State of Colorado, Appellee, In the Interest of J.R.N., Jr., a Child, and Concerning J.R.N., Appellant, and S.D.N., Appellee. JUDGMENT AFFIRMED Division III Opinion by JUDGE FURMAN Lipinsky and Brown, JJ., concur NOT PUBLISHED PURSUANT TO C.A.R. 35(e) Announced January 27, 2022 Lance J. Ingalls, County Attorney, R. LeeAnn Reigrut, Assistant County Attorney, Lori Kennedy, Assistant County Attorney, Castle Rock, Colorado, for Appellee Debra W. Dodd, Guardian Ad Litem Peak Family Law, L.L.C, Sean S. Peek, Ricardo Vasquez, Denver, Colorado, for Appellant 
 Griffiths Law PC, Leslie Hansen, Lone Tree, Colorado, for Appellee S.D.N. 
1 ¶ 1 In this dependency and neglect case, J.R.N. (father) appeals a juvenile court judge’s allocation of parental responsibilities (APR) for J.R.N., Jr. (the child), to S.N. (mother). He contends that we should reverse the APR for two primary reasons: (1) the judge erroneously upheld a magistrate’s decision that the child was not required to participate in reintegration therapy with him, and (2) the Douglas County Department of Human Services (Department) did not make diligent efforts to reunify him with his child. We disagree with each of father’s contentions and affirm the APR. I. The APR ¶ 2 In the answer brief, the child’s guardian ad litem (GAL) aptly summarizes this case as follows. “For years [the child] has been caught in the middle of his parents’ bitter custody battle; a fight which began as a domestic relations case, morphed into a dependency and neglect case, and stands now as an appellate case. In fact, it was ‘one of the most atrocious divorce cases’ the court had witnessed.” ¶ 3 Father’s case on appeal requires us to address orders entered by a magistrate and juvenile court judge in this dependency and neglect case. We put these orders in context. 
2 ¶ 4 In April 2019, the Department received a report that the then twelve-year-old child had been hospitalized for mental health concerns. The Department filed a petition alleging that the child was dependent or neglected. ¶ 5 The parents were involved in a dissolution of marriage case in Arapahoe County that included post-decree litigation. As part of the Arapahoe County case, the child and father participated in reintegration therapy. The Department received a report that the child was “refusing to have contact with his father [and] that reintegration sessions had not been going well.” ¶ 6 A magistrate initially gave the Department temporary protective custody of the child, and later ordered the child into mother’s legal custody with the Department’s supervision. Later still, the Department placed the child with maternal grandmother due to “concerns that [mother] was not ensuring that [the child] was attending school . . . [and] that she was possibly not meeting his mental health needs or his medical needs.” ¶ 7 But, in May 2019, on the recommendation of the child’s then-
therapist, the magistrate returned custody of the child to mother. The child remained at home with mother for the rest of the case. 
3 That same month, the domestic relations court certified the parenting time and custody issues from the dissolution case into the dependency and neglect case. ¶ 8 In June 2019, a magistrate ordered that reintegration therapy be stopped. About six months later, both parents stipulated to the allegations in the petition, and the court adjudicated the child dependent or neglected. Father’s signed stipulation included: [Father] is in agreement with the attached treatment plan, provided that all parties recognize that time is of the essence with respect to [father and child] engaging in reintegration therapy so that parenting-time between [f]ather and [the child] can be re-
established as soon as practical and in the best interests of the child. ¶ 9 The court adopted treatment plans for both parents. Father’s treatment plan required him to participate in reintegration therapy with the child. This would become a central issue in this case. ¶ 10 It was undisputed that, after the adoption of father’s treatment plan, the magistrate twice interviewed the child (on June 25, 2019, and August 23, 2019). In these interviews, the child expressed that he did not want to have contact with father. 
4 ¶ 11 In October 2019 and in December 2019, father filed forthwith motions regarding discovery and placement. ¶ 12 In December 2019, the magistrate held a hearing to address father’s forthwith motions. At this hearing, the parties also discussed (1) their inability to agree on a new reintegration therapist for the child; (2) whether the child should begin trauma therapy; and (3) whether father should begin reintegration therapy on his own. The magistrate concluded that the previous reintegration therapist should separately work with father, and that the child should begin trauma therapy with a therapist selected by the GAL. Father’s placement motions were set for a contested hearing in June 2020. ¶ 13 In January 2020, father filed a “Forthwith Motion of Lack of Reasonable Efforts and for Selection of Therapist,” contending that the parties could not agree on a trauma therapist for the child. The magistrate set a hearing on this matter for February 2020. At this hearing — which proceeded without taking testimony or entering evidence — the GAL reported that the child did not want to participate in reintegration therapy. 
5 The more I’ve thought about it, Your Honor, and the more -- having gone through this process of trying to select a therapist for him, I had to question myself why we are forcing this child to do something that he has been so adamantly against. He is doing quite well at this point. He is attending school; he loves his school. His attendance is not perfect by any means, but I think you look back a year ago, he was hospitalized at Denver Springs after having a Skype session in reintegration therapy with his dad. As the Court knows, I mean, it’s been up and down as far [as] him having self-
harming behaviors, and he is very stable right now. He reported to me on Thursday that he has not had any thoughts of self-
harming . . ., and that was towards the end of the summer. He is engaging with friends. His social-emotional skills at school, according to the principal and to the school psychologist, are very strong. He’s actually seen as a leader. He himself has set a goal that he wants to get a 4.0. So he has really good goals for himself and he’s following through on them. He’s also making friends at school, which is new. He’s having friends over for play dates. He’s going to friends’ homes, that’s also new for him. So he’s doing really well. The only reason that we would put him into trauma therapy at this point is to address the issues with his dad. 
6 We’ve been at this for ten months as far as trying different approaches to the reintegration therapy, and quite honestly, the only time that [the child] has really been able to stabilize is when the Court put reintegration on hold. And I think it’s the fact that he didn’t have that weighing on him. So my concern is, if we push him and force him to do trauma therapy at this point -- and he knows that if he does trauma therapy the goal is to get him into reintegration therapy. He’s a smart kid; it’s going to be weighing him again, and I think there’s a very good chance that it’s going to derail the progress that he has made. After hearing this report from the GAL, the magistrate determined that she was not going to order “the child to be forced into reintegration therapy.” ¶ 14 One month later, the magistrate filed a written order from the February 2020 hearing. In this order, the magistrate again denied father’s request to start reintegration therapy with the child, finding that the Department had made reasonable efforts to find a suitable therapist and that it was not in the child’s best interests to see his father. ¶ 15 Father petitioned for judicial review, claiming the magistrate’s decision to not compel the child into reintegration therapy was 
7 unsupported and an improper delegation of parenting time. The judge affirmed, concluding that “it is not in the best interest of the minor child . . . to be forced to see [father].” The court pointed out that the magistrate was familiar with “the child, the child’s record, [and] the facts.” ¶ 16 The GAL later moved to allocate parental responsibilities for the child to mother. Mother filed a response and asked that she be allowed to relocate with the child to Texas. Father objected, contending that an APR would not be in the child’s best interests. He also asked that the matter be heard by a judge. ¶ 17 The judge held a hearing on the APR motion in October 2020. After the hearing, the judge made an APR, ordering that mother be the child’s primary residential custodian and giving her authority to make the day-to-day decisions for the child. ¶ 18 Father’s appeal challenges the judge’s review of the magistrate’s order from the February 2020 hearing and the judge’s October 2020 APR. We address each challenge in turn. 
8 II. Review of the Magistrate’s Order from the February 2020 Hearing ¶ 19 Father contends that the judge erred by affirming the magistrate’s decision to not require the child to participate in reintegration therapy. We disagree. A. Standard of Review ¶ 20 Section 19-1-108(5.5), C.R.S. 2021, provides for judicial review of a magistrate’s order in a dependency and neglect case. Because the judge reviews only the record of the hearing before the magistrate, its review is similar to an appellate review of the magistrate’s decision. People in the Interest of J.G., 97 P.3d 300, 302 (Colo. App. 2004). Our review, therefore, is like a second level of appellate review. Id. ¶ 21 But the parties disagree on our standard of review. On the one hand, father contends that we should apply de novo review because resolution of this issue requires us to apply the Children’s Code to evidentiary facts. On the other hand, the remaining parties contend that we should apply a clearly erroneous standard of review. We disagree with father because the magistrate’s decision of whether to require the child to participate in reintegration 
9 therapy is a factual question. And factual questions “shall not be set aside unless clearly erroneous.” People in the Interest of A.J.L., 243 P.3d 244, 249 (Colo. 2010). B. Analysis ¶ 22 We conclude that the record supports the judge’s order affirming the magistrate’s decision from the February 2020 hearing. Id. We reach this conclusion for two reasons. ¶ 23 First, the record reveals that father had not had any visits with the child for over eight months before the dependency and neglect case began and that the child had a serious trauma response brought on by contact with father. ¶ 24 Second, the magistrate properly considered the position of the child, who was thirteen years old and gave input to the professionals involved, when declining to order reintegration therapy. See People in the Interest of H.K.W., 2017 COA 70, ¶ 3. Father does not point to any authority — nor are we aware of any — that would suggest the magistrate erred by relying on in camera interviews with a child to inform her decision. See § 19-1-106(5), C.R.S. 2021 (providing that a child “may be heard separately when deemed necessary” by the court). And father didn’t designate 
10 transcripts of these interviews, so we presume the record supports the magistrate’s decision. See Colo. Dep’t of Pub. Health & Env’t v. Bethell, 60 P.3d 779, 787 (Colo. App. 2002) (when appellant does not provide a complete record on appeal, we presume the record supports the trial court’s conclusions). ¶ 25 Father’s reliance on People in Interest of D.G., 140 P.3d 299 (Colo. App. 2006), for the proposition that the magistrate erred by not ordering the child to engage in reintegration therapy is misplaced. In D.G., the division concluded that a juvenile court erred by terminating parental rights because the parent’s treatment plan did not include face-to-face visitation and was, thus, inappropriate. The division reasoned that “absent safety concerns, a parent is entitled to face-to-face visitation” with the child. Id. at 302. But this case does not involve a termination of parental rights, and the magistrate knew of the child’s trauma response brought on by contact with father. ¶ 26 Father also contends that the magistrate’s decision included an improper “delegation to the child of the decision regarding parenting-time/visitation.” We disagree because the magistrate’s 
11 order did not include such delegation. Parenting time was addressed in the judge’s APR. ¶ 27 But wait, says father. The magistrate did not take any evidence at the February 2020 hearing. Father misses the point. The judge determined and the record reveals that “the magistrate was familiar with the child, the child’s record, [and] the facts.” And father does not contest this determination. III. The Judge’s October 2020 APR ¶ 28 Father next contends that we should reverse the APR because the Department did not make diligent efforts to reunify him with his child. We disagree. A. Law ¶ 29 When entering an APR, the juvenile court must “be guided by the underlying purposes of the [Children’s] Code.” L.A.G. v. People in Interest of A.A.G., 912 P.2d 1385, 1391 (Colo. 1996). But the Children’s Code does not define factors the juvenile court must consider in allocating parental responsibilities. People in Interest of C.M., 116 P.3d 1278, 1281 (Colo. App. 2005). Instead, the juvenile court “must allocate parental responsibilities based on the best 
12 interests of the child and the public.” H.K.W., ¶ 13; see § 19-3-
508(1)(a), C.R.S. 2021. ¶ 30 The juvenile court may consider the best interest factors listed in the Uniform Dissolution of Marriage Act, § 14-10-124(1.5)(a), C.R.S. 2021, if the focus is on the protection and safety of the child and not on the “custodial interests” of the parents. L.A.G., 912 P.2d at 1391-92; People in Interest of M.D., 2014 COA 121, ¶ 12; C.M., 116 P.3d at 1282. And the court may consider the “wishes of the child if he or she is sufficiently mature to express reasoned and independent preferences as to the parenting time schedule.” H.K.W., ¶ 13. B. Standard of Review ¶ 31 We will not disturb a juvenile court’s factual findings when they are supported by the record. People in Interest of J.G., 2021 COA 47, ¶ 17 (examining whether the juvenile court erred in allocating parental responsibilities in a dependency and neglect case). But whether the juvenile court applied the correct legal standard in making its findings is a question of law we review de novo. Id. 
13 C. Analysis ¶ 32 Father contends that the Department did not make diligent efforts to reunify him with his child for three broad reasons. He contends that (1) his treatment plan required “progress toward reintegration therapy” and this did not happen; (2) his treatment plan should have included, and the Department did not include in its services, an assessment for parental alienation; and (3) his treatment plan should have provided for face-to-face visitation. We conclude the record supports the judge’s APR. 1. Reintegration Therapy ¶ 33 In allocating parental responsibilities, the judge found as follows.  “[T]his is [a] dependency and neglect case with the goal of returning the child home, which has been accomplished.”  The expert testimony of the caseworker, psychotherapist, and trauma therapist “accurately portray[ed] [the child’s] mental health conditions and fear of [father] [which] support[s] the finding that [the child] continues to have anxiety and fear of [father].” 
14  “[R]eintegration therapy is traumatic” for the child, and that, “if he were required to participate [in it] prior to completing trauma therapy . . . he could self-harm.” ¶ 34 We conclude that the record supports the juvenile court’s findings. See J.G., ¶ 17. ¶ 35 The record contains the following evidence.  A psychotherapist testified that he observed the child to show “hesitance [and] expressed a desire to not want to do [reintegration] therapy.” “There were times,” according to the psychotherapist’s testimony, that the child would “put a blanket over his head and not want to . . . talk about [reintegration therapy].”  The caseworker testified that, as of the APR hearing, the child “remained clear that he does not wish to have contact with his father” and that the child “continues to be very clear that he does not wish to participate in any reintegration therapy.”  The child’s trauma therapist, who was qualified as an expert in child therapy with a specialization in trauma therapy, testified that she was asked to work with the child to see “if we could get him to a point where he would one day be ready for 
15 reintegration therapy.” But she concluded that the child was not ready for trauma therapy.  The trauma therapist also opined, “I do not recommend that he be forced to do reintegration therapy until trauma therapy is completed. Because I think it will cause decompensation.” She clarified that “decompensate[ion] means that he could become suicidal again.” ¶ 36 And the caseworker testified that father could have participated in reintegration therapy, even without the child’s participation. 2. Parental Alienation ¶ 37 We note first that the record shows that parental alienation and enmeshment are related. The trauma therapist testified that enmeshment was a symptom of parental alienation. ¶ 38 The judge found as follows:  The Department recognized that enmeshment between mother and the child was a possibility.  The Department hired a psychoanalyst to assess whether enmeshment was an issue. 
16  One of father’s experts — a Child and Family Investigator (CFI) from the parent’s dissolution of marriage case, qualified as an expert in child family psychology and child family investigation — could not “draw conclusions there is enmeshment because of his limited ability to assess the parties.”  The CFI “was not convinced that enmeshment or parental alienation exists in their relationship” and characterized mother and child’s bond as “healthy” and “strong.” “Mother has demonstrated her ability to meet [the child’s] physical, mental, and emotional needs and to place his needs above her own.” ¶ 39 We conclude that the record supports the juvenile court’s findings about parental alienation and parental enmeshment. See J.G., ¶ 17. We come to this conclusion for four reasons: ¶ 40 First, the record contains the following evidence.  The caseworker testified that “there might be enmeshment.”  The Department tasked a psychotherapist — qualified as an expert in in-home cognitive behavioral therapy — to assess the relationship between mother and the child and to determine whether he saw any “enmeshment qualities.” 
17  The psychotherapist opined that enmeshment qualities included (1) “whether or not the emotional states of the parents and children mimic each other”; (2) whether adults talk over children when questions are presented; and (3) whether the adults allow the children to share what they are feeling. He testified that he had observed no such qualities between mother and son. ¶ 41 Second, although father contends that the juvenile court mischaracterized the CFI’s testimony, the record supports the court’s description of the CFI’s inability to reach a conclusion about alienation. The CFI opined that when he was involved in the case a year and half earlier, there “were very porous boundaries between [mother] and [the child].” He testified he was not asked, in the Arapahoe County case, to report on alienation, but that “he would have put [a discussion of alienation] into [his] final report.” ¶ 42 Despite this, the CFI could not conclude that alienation existed when he worked with the family because he did not have enough information about the case. The CFI never made a final report, let alone one that concluded alienation existed, in the Arapahoe County case before that case was certified into the 
18 dependency and neglect case. And, at the time of the APR hearing, the CFI did not have enough information to make conclusions about alienation. ¶ 43 Third, to the extent father asks us to consider his expert’s alienation factors, we decline to do so. This is a matter properly reserved for the juvenile court judge. See People in Interest of S.M.A.M.A., 172 P.3d 958, 962 (Colo. App. 2007) (we defer to the juvenile court’s resolution of any conflicts in the evidence). And we have concluded that there is record support for the judge’s findings. ¶ 44 Fourth, although father also contends that the judge made inaccurate findings about the child’s relationship to mother, there is record evidence to support the judge’s characterization of the mother-child relationship. The caseworker testified that she saw mother and the child together monthly and that “their relationship is very comfortable for [the child].” And she had no concerns “from a child protection standpoint” with the relationship’s dynamics. 3. Face-to-Face Visitation ¶ 45 The judge found that it was in “the best interests of the child that parenting time” for father “shall not occur until further order of 
19 the court and once [the child] has successfully completed trauma therapy.” ¶ 46 We conclude that the record supports the court’s finding. See J.G., ¶ 17. ¶ 47 At the APR hearing, multiple experts testified that the child’s safety was affected by contact with father. For example, the caseworker testified that the child had been hospitalized after threatening suicide because “he felt forced to have communication with his father.” Similarly, the child’s trauma therapist opined, “I do not recommend that he be forced to do reintegration therapy until trauma therapy is completed. Because I think it will cause decompensation.” She clarified that “decompensate means that he could become suicidal again.” ¶ 48 True, section 19-3-208 requires the Department to provide visitation in out-of-home placement in every dependency and neglect proceeding. See People in Interest of A.A., 2020 COA 154, ¶ 17. But the child was not in out-of-home care, having been placed with mother. And even if we concluded that the requirement of face-to-face visitation nevertheless applies, the child’s health and safety are the paramount concerns in determining whether 
20 visitation services are necessary and appropriate. See id. The judge considered these concerns in its order. ¶ 49 Father’s reliance on People in Interest of E.S., 2021 COA 79, ¶ 23, for the proposition that a juvenile court commits error when it denies face-to-face visitation for a parent is also misplaced. In E.S., the division held that the Department may not bar visitation with a parent simply because a parent has an outstanding warrant, without considering child safety. Id. Whereas, here, the record is clear that contact with father created a safety concern for the child. ¶ 50 Father’s reliance on A.A. for the proposition that the Department does not provide reasonable efforts when it does not provide referrals for therapy or therapeutic visitation between a parent and a child reluctant to visit is also misplaced. Unlike in A.A., here, the Department provided therapy and reintegration services to father on his own; father refused these services. ¶ 51 To the extent father contends that his due process rights were violated by the judge’s APR, we conclude father was afforded sufficient protections. Although a termination of parental rights implicates a parent’s fundamental liberty interest in the care, custody, and control of their children, see Troxel v. Granville, 530 
21 U.S. 57, 66 (2000), a parent’s due process rights in an APR to another parent is circumscribed, at best. See People in Interest of L.B., 254 P.3d 1203, 1206 (Colo. App. 2011) (parent has no due process right to counsel when the state seeks to award custody of the children to another parent). ¶ 52 Father’s reliance on People in Interest of B.J.D., 626 P.2d 727, 730 (Colo. App. 1981) is misplaced. In B.J.D., the division concluded that the parent’s treatment plan was not appropriate because it had unrealistic requirements. See id. at 729-30. But, here, the Children’s Code contains no provision requiring a court to consider the appropriateness of the parent’s treatment plan before ordering an APR. See C.M., 116 P.3d at 1281. And the court appropriately considered the best interests of the child in allocating parenting responsibilities for the child to mother. H.K.W., ¶ 13. IV. Conclusion ¶ 53 The APR judgment is affirmed. JUDGE LIPINSKY and JUDGE BROWN concur.