■ The People finally contend the trial court erred in dismissing the charge of offering a false instrument for recording. Again, we agree.

■

The PEOPLE of the State of Colorado, In the Interest of D.G., M.G., and S.G., Children, Upon the Petition of the El Paso County Department of Human Services, Petitioner–Appellee,

and Concerning G.D. and L.G., Respondents–Appellants.

No. 05CA2418.

Colorado Court of Appeals, Div. III.

May 18, 2006.

Certiorari Denied July 31, 2006.

Patricia L. Martin, Guardian Ad Litem.

William Louis, County Attorney, Laura C. Rhyne, Deputy County Attorney, Colorado Springs, Colorado, for Petitioner–Appellee.

Susan L. Mueller, P.C., Susan L. Mueller, Colorado Springs, Colorado, for Respondent–Appellant G.D.

Davide C. Migliaccio, Colorado Springs, Colorado, for Respondent–Appellant L.G.

TAUBMAN, J.

L.G. (mother) appeals from a judgment terminating the parent-child legal relationship between her and her children, D.G., M.G., and S.G. G.D. (father) appeals from the judgment terminating his parental rights as to D.G. and M.G. We reverse as to mother and affirm as to father.

We hold that absent safety concerns, a parent is entitled to face-to-face visitation, and correspondence between parents and children does not constitute visitation. We further hold that the trial court may not delegate the determination of entitlement to visitation to caseworkers, therapists, and others.

### I. Mother's Appeal

Mother contends that the trial court erred in terminating her parental rights based on its finding that the El Paso County Department of Human Services (department) made reasonable efforts to rehabilitate her and to reunite the family. Specifically, she argues that the department prevented reunification by prohibiting face-to-face visitation between mother and her children after she was released from prison and sentenced to a community corrections facility (ComCor). We agree.

In determining a parent's unfitness for the purposes of § 19–3–604(1)(c)(II), C.R.S.2005, the trial court may consider whether reasonable efforts by child-caring agencies have been unable to rehabilitate the parent. Section 19–3–604(2)(h), C.R.S.2005.

Section 19–3–208, C.R.S.2005, sets forth the services to be provided to meet the reasonable efforts standard. *See* §§ 19–1–103(89), 19–3–100.5, C.R.S.2005. Pursuant to that statute, visitation services for parents with children in out-of-home placements must be provided as determined necessary and appropriate by a case assessment and the individual case plan. Section 19–3–208(1), (2)(b)(IV), C.R.S.2005; *People in Interest of B.C.*, 122 P.3d 1067 (Colo.App.2005).

█ In determining whether visitation services are necessary and appropriate, the health and safety of the children are the paramount concerns. Sections 19–1–103(89), 19–3–100.5(2), C.R.S.2005; *People in Interest of B.C., supra.* Questions concerning the child's health and safety are matters entrusted to the sound discretion of the trial court. *People in Interest of B.C., supra.* Nevertheless, the Children's Code requires the trial court itself to make decisions regarding visitation, and it may not delegate this function to third parties. *People in Interest of B.C., supra.*

The record here reveals that this was the third dependency and neglect proceeding involving mother and her children. After each of the two prior dependency and neglect cases was closed, the children were returned to mother and father.

When this case was filed in June 2004, mother was incarcerated. In May 2005, she was transferred to ComCor, where it was undisputed that face-to-face visitation with the children could have taken place.

Nonetheless, during the course of this case, mother was not afforded the opportunity for any face-to-face visitation. The original treatment plan, filed September 13, 2004,

provided in part that mother "will participate in visitation with her children, as arranged by the Caseworker, GAL [guardian ad litem] and CASA [court appointed special advocate] and approved by the Court." The trial court's order of September 16, 2004 provided that the caseworker and the GAL would have the authority to set up and modify the visitation among the children, mother and father. It provided, however, that the children could not visit mother in jail. In addition, it provided that the children would have no contact with mother except as set up and approved by the caseworker and the GAL. On October 1, 2004, the department submitted an addendum to the treatment plan which provided in part that mother would have weekly, supervised, face-to-face visitation of ninety minutes. The amended treatment plan also provided that "there is to be no discussion of the case or promises regarding when the children will return home."

In addition, the amended treatment plan provided: "Visitation plan may be modified through the agreement of the following parties or by the Department in emergency situations for child safety reasons: The Caseworker, the CASA, the GAL and any therapists involved."

On October 26, 2004, the court entered an order approving the proposed treatment plan described above. The order noted that, according to the caseworker, the children were desperate to see their parents, that the CASA disagreed with any visitation between the children and mother, and that the GAL wanted mother to begin the treatment plan before the initiation of visitation between mother and the children. It also noted that the GAL wanted to talk with the children's therapist before the commencement of visitation.

On December 13, 2004, the department filed a Family Services Plan, which provided in part that mother "will participate in parenting time with her children according to the visitation plan Part III B, with contact increasing as return home nears." However, Part III B, the visitation plan, provided only for written communication between mother and her children and required that "letters must go through the children's therapist."

Just as the amended treatment plan provided, the family services plan included a provision that "visitation plan may be modified through the agreement of the following parties or by the Department in emergency situations for child safety reasons: The Caseworker, the GAL, the CASA and any therapists involved."

Following a permanency planning hearing in December 2004, the court entered an order on January 13, 2005, again approving the treatment plan, as amended. The court also approved the department's permanency plan and noted that there was a substantial probability that the children would not be returned to the physical custody of the parents within six months. The order noted that mother had been sentenced to the Department of Corrections for four years and that it was anticipated that she would be back in the community and able to work on her treatment plan in the spring of 2005, but she would not have a home for some time after that. The order also noted that the department projected that the children would be adopted by December 17, 2005 and that "procedural safeguards to preserve parental rights have been applied in connection with any change in placement or any determination affecting parental visitation."

During the hearing on the department's motion for termination of parental rights in October 2005, much of the testimony focused on mother's inability to visit her children during the previous five months, when she had been in ComCor. The thrust of the testimony of the caseworker, the CASA, and the children's therapist was that allowing any visitation between mother and her children would make it more difficult for the children to adjust to their placement with the foster parents. For example, the caseworker testified that although she knew that mother had requested visitation, she did not agree that visitation should occur. She further explained that she proposed the letter writing because she felt it would help the children adjust better to their foster care placement.

The CASA testified that at no time during this case had she recommended visitation with the parents. She said she disagreed with the part of the initial treatment plan

that provided for visitation. According to the CASA, she was not in favor of setting the children up for another disappointment. She added, "Right from the beginning, I had stated that visitation should begin only after the treatment plan was working, and there were reasonable expectations that we could reunify the children." Accordingly, she testified that she would not have recommended any visitation until the treatment plan was substantially complete.

In the same vein, the children's therapist testified that he did not believe that he had ever recommended face-to-face visitation. He explained that it was his feeling, in consultation with the caseworker, that "[t]his would create more confusion and more difficulty for them to adjust in the current placement." The therapist also admitted that one of his main priorities was to foster a bond between the children and the foster parents and not with mother and father. Finally, he testified that he had talked with the children about termination and adoption but not about the possibility of reunification with their parents. The therapist also acknowledged that mother had requested visitation, but explained that he and the caseworker had decided to deny visitation.

In contrast, Dr. Hammock, mother's expert, testified based on his interviews with the caseworker, the GAL, and others that he believed that they had stopped working wholeheartedly toward the goal of reunification with the parents. Dr. Hammock further stated that it was his understanding that the children had not been informed that mother was out of DOC and was in ComCor. He observed that the caseworker and the GAL had concluded that it was not in the children's best interests to allow visitation.

However, Dr. Hammock testified that based on his information and review of numerous other treatment plans, he saw no reason why visitation would be inappropriate, pointing out that mother had been as compliant as a respondent mother could possibly be. He added that mother had substantially complied with the treatment plan, and he observed that "as a general principle, contact between parents and children is crucially important."

The CASA testified that she "absolutely agreed" that mother was in substantial compliance with the treatment plan. This view was echoed by the caseworker, who agreed that mother had complied with the treatment plan, except for the criterion of obtaining separate housing.

In that regard, mother testified that approximately two weeks after the termination hearing, she expected to be released into the community, either on parole or under intensive supervised probation.

■ Given these circumstances, we conclude the trial court erred in finding that the department had provided appropriate rehabilitative services, including visitation, and thereby erred in terminating mother's parental rights.

■ The purpose of a treatment plan is to preserve the parent-child legal relationship by assisting the parent in overcoming the problems that required intervention into the family. *People in Interest of M.M.,* 726 P.2d 1108 (Colo.1986). A treatment plan is appropriate if it "is reasonably calculated to render the particular [parent] fit to provide adequate parenting to the child within a reasonable time" and "relates to the child's needs." Section 19-1-103(10), C.R.S.2005.

Here, the trial court acknowledged that "ordinarily the court does not approve a treatment plan that does not allow face-to-face visitation with children." However, the court concluded that such a limitation was appropriate here given the prior dependency and neglect proceedings.

However, in reaching this conclusion, the trial court did not take into account the requirement that a treatment plan must be reasonably calculated to render a parent fit to provide adequate parenting to the child within a reasonable time. Instead, it approved an amended treatment plan that improperly delegated to the caseworker, the CASA, the GAL, and the children's therapist the determination of when mother could have face-to-face visitation with her children. *See People in Interest of B.C., supra.* As a result, the amended treatment plan was doomed to failure from the very beginning.

Given the views of the caseworker, the CASA, and the therapist that it was more important for the children to develop strong ties with the foster parents, there was no opportunity for mother to interact with her children and demonstrate that she could be a good parent during the five months before the termination hearing.

Further, the record reveals that while mother wrote appropriate letters to her children, the department viewed those letters, not as a means of strengthening the bond between mother and her children, but rather as a method to encourage the children to behave properly with their foster parents and thereby facilitate a permanent placement with the foster parents. This focus was inconsistent with the purpose of a treatment plan. *See People in Interest of M.M., supra.* It is also inconsistent with the admonition of the supreme court, made in the related context of sustaining the dismissal of a dependency and neglect petition:

> [A] child cannot be deemed "neglected" merely because the People contend that his condition would be improved by changing his parents or custodians. A perfect home does not exist; a child may receive love, care, and guidance in a variety of settings; forced separation from a child's environment often proves detrimental to his well being.

*People in Interest of T.H.*, 197 Colo. 247, 249, 593 P.2d 346, 348 (1979).

Indeed, the caseworker's admission that she did not advise the children until late August or early September 2005 that mother had been placed in ComCor demonstrates further that the department's primary focus was in strengthening the children's ties with the foster parents, rather than with mother and father.

Thus, the testimony regarding the statement of the oldest child that if he were returned to mother's custody, he would probably become a drug addict and a school dropout, must be viewed in the context of his lack of opportunity to have any person-to-person contact with mother.

Indeed, while the trial court acknowledged that mother "since her time at ComCor has done a fabulous job of trying to get her life together," the department did not timely disclose her progress at ComCor to the oldest child or his siblings.

Further, we conclude that the trial court erred in approving a case plan that provided for written communication in lieu of visitation services. As noted, § 19–3–208(2)(b)(IV) provides that visitation services are among the services that "shall be available and provided, as determined necessary and appropriate by individual case plans."

Written communication between parents and children, rather than visitation may be necessary in certain cases, including those involving incarcerated parents or parents alleged to have committed sexual assault. However, simply stated, written communication is not visitation. The term visitation contemplates face-to-face encounters between parents and children. *See Black's Law Dictionary* 1602, 1603 (8th ed.2004)("visitation" means, inter alia, "a relative's, especially a noncustodial parent's period of access to a child"; "visitation right" means, inter alia, "a noncustodial parent's ... court-ordered, privilege of spending time with a child who is living with another person, usually the custodial parent," and "[t]he noncustodial parent with visitation rights may sometimes be a parent from whose custody the child has been removed because of abuse or neglect").

Such encounters did not occur here after mother was transferred to ComCor, not because of any concern about the children's physical health and safety, but rather, because of the department's generalized belief that the children could be emotionally harmed if they had any personal contact with their parents.

Given the omnipresent concern with permanence and stability for children, there was no way that mother could substantially comply with the terms of the amended treatment plan and then be accorded an additional period in which to have personal interaction with her children in order to avoid a termination of parental rights.

Finally, this is not a case where the department at any time concluded pursuant to

§ 19-3-508(1)(e), C.R.S.2005, that the establishment of a reasonable treatment plan could not be accomplished. Had the department made such a determination, then no efforts to provide written communication or visitation would have been necessary.

Consequently, mother was never afforded the opportunity to have personal, face-to-face visitation with her children to demonstrate that, based on her significant accomplishments while incarcerated and at ComCor, she could become a good parent and avoid termination of her parental rights.

Accordingly, we conclude that the trial court erred in terminating mother's parental rights.

## II. Father's Appeal

However, we reject father's arguments that the trial court erred in terminating his parental rights.

### A.

Father contends that the trial court abused its discretion in concluding he had not complied with the amended treatment plan. We disagree.

■ To terminate the parent-child legal relationship pursuant to § 19-3-604(1)(c), C.R.S.2005, clear and convincing evidence must establish that the child has been adjudicated dependent or neglected; that an appropriate treatment plan, approved by the trial court, has not been complied with by the parent or has not been successful in rehabilitating the parent; that the parent is unfit; and that the parent's conduct or condition is unlikely to change within a reasonable time. *People in Interest of A.M.D.*, 648 P.2d 625 (Colo.1982).

■ The credibility of the witnesses and the sufficiency, probative effect, and weight of the evidence, as well as the inferences and conclusions to be drawn from it, are within the discretion of the trial court. Thus, a trial court's findings and conclusions will not be disturbed on review if the record supports them. *People in Interest of C.A.K.*, 652 P.2d 603 (Colo.1982).

### 1.

■ Father contends that the trial court erred in concluding that reasonable efforts were made to reunify the children with the parents. We disagree.

Like mother, father argues that the caseworker, the CASA, and the children's therapist all testified that they did not want to pursue reunification with the parents unless the parents had met an artificially high standard of compliance with the treatment plan. As discussed above, we agree with father to the extent that he argues that these individuals focused on strengthening the children's ties with the foster parents rather than with him and mother.

Indeed, father testified that many of his letters intended for the children were not deemed appropriate by the caseworker or the children's therapist. For example, he testified that his daughter had sent him a letter saying she was looking out the windows and looking at the moon and stars and knew that he and mother were looking at the same moon and stars. Although father responded in a letter, "Keep that thought because we are," the response was deemed inappropriate. According to father, his letters that were approved consisted of, "Hi, how are you? I miss you. Love, Dad."

In addition, father testified that when he told the caseworker that he did not feel as if his letters were getting through to his children, the caseworker responded, "Well, take me to court."

For the reasons discussed above with respect to mother's appeal, we agree with father that it was inappropriate for the department to focus its efforts on strengthening the bond with the foster parents rather than on reunification with father and mother.

However, we conclude that there was no reversible error as to father because of the significant difference between his circumstances and those of mother. Once mother was released from prison to ComCor, she was available to have face-to-face visitation with the children, but was not afforded that opportunity. Father, in contrast, remained incarcerated as of the date of the termination hearing. Although he did not present an

expert witness on his behalf, mother's expert, Dr. Hammock, testified that he did not believe that person-to-person visitation was appropriate with a parent who was incarcerated. Therefore, father did not present evidence to support his contention that face-to-face visitation was feasible as long as he was incarcerated.

Accordingly, the trial court properly concluded that reasonable efforts had been made to reunify father with his children.

### 2.

■ We perceive no abuse of discretion in the trial court's findings that father did not reasonably comply with the treatment plan and that the plan was not successful. Although father participated in several programs available at the facility in which he was incarcerated, he was still incarcerated on the date of the termination hearing and was unavailable to parent the children as of the December 2005 date set forth in the amended treatment plan. Therefore, the trial court's findings will not be disturbed on review. *See People in Interest of C.A.K., supra.*

### 3.

■ Father also contends that the trial court erred in finding that he was unfit and that his conduct or condition was unlikely to change within a reasonable time. We find no error.

An unfit parent is one whose conduct or condition renders him or her unable to give a child reasonable parental care. Reasonable parental care requires, at a minimum, that the parent provide nurturing and protection adequate to meet the child's physical, emotional, and mental health needs and conditions. Section 19–3–604(2), C.R.S.2005.

Among the factors to be considered in determining a parent's unfitness are the parent's incarceration, excessive use of controlled substances, and neglect of the child. Section 19–3–604(2)(a), (e), (f), C.R.S.2005; *People in Interest of M.H.,* 10 P.3d 713 (Colo. App.2000). The trial court may also consider whether reasonable efforts by child-caring agencies have been unable to rehabilitate the parent. Section 19–3–604(2)(h).

■ In determining whether a parent's conduct or condition is unlikely to change within a reasonable time, a trial court may consider whether any change has occurred during the pendency of the dependency and neglect proceeding, the parent's social history, and the chronic or long-term nature of the parent's conduct or condition. *People in Interest of D.L.C.,* 70 P.3d 584 (Colo.App. 2003). A reasonable time is not an indefinite time, and it must be determined by considering the physical, mental, and emotional conditions and needs of the child. *People in Interest of D.L.C., supra; see* § 19–3–604(3), C.R.S.2005.

Here, the trial court based its findings of unfitness and unlikelihood of change on several factors. First, the court noted father's prior neglect of the children, which was evidenced by his inability to assure their school attendance, their resultant education delays, and the two prior dependency and neglect proceedings. Next, the court noted father's history of substance abuse and criminal activity. Finally, even though father was eligible for parole about six months after the termination hearing, the court concluded that his incarceration made him unavailable to parent the children and prevented him from providing a stable home within a reasonable time to meet their needs for stability and permanence. These findings comport with applicable law and are supported by the record. Therefore, they will not be disturbed on review. *See People in Interest of C.A.K., supra; People in Interest of D.L.C., supra; People in Interest of M.H., supra.*

### B.

Father next contends that the "permanency guidelines" should have been extended because of his incarceration. His contention is premised on § 19–3–604(1)(b)(III), C.R.S. 2005, which was not the basis of termination here. Instead, termination was premised on the criteria set forth in § 19–3–604(1)(c), which we have determined were established by clear and convincing evidence.

## C.

 Finally, father contends that trial counsel's failure to object to the appointment of the CASA volunteer constituted ineffective assistance of counsel. He argues that the appointment was prejudicial because the CASA volunteer had been involved in the prior dependency and neglect proceedings, was the legal guardian of an adult, disabled sibling of the children, and was opposed to reunification from the outset as indicated by her refusal to recommend visitation with the children. We disagree.

A parent who asserts a claim of ineffective assistance of counsel has the burden to show that counsel's performance fell below the level of reasonably competent assistance and that counsel's deficient performance was so prejudicial as to deprive the parent of a fair hearing. *People in Interest of V.M.R.*, 768 P.2d 1268 (Colo.App.1989). To establish prejudice, a parent must show there is a reasonable probability that, but for counsel's deficient performance, the outcome of the hearing would have been different. *See People v. Garcia*, 815 P.2d 937 (Colo. 1991); *People v. Palmer*, 888 P.2d 348 (Colo. App.1994). If a parent fails to demonstrate prejudice, the ineffective assistance claim may be resolved on that basis alone. *See People v. Garcia, supra.*

A CASA volunteer is charged with the responsibility of assuring that the child's best interests are advocated at every stage of a dependency and neglect proceeding. Section 19–1–208(3), C.R.S.2005. To fulfill this responsibility, the CASA volunteer may conduct an independent investigation to provide factual information to the court. The investigation must include interviews with and observations of the child, interviews with other appropriate individuals, and review of relevant records and reports. Section 19–1–208(1)(a), C.R.S.2005.

Here, the CASA volunteer's familiarity with the family enhanced her ability to fulfill her statutory obligations. Further, the record reveals that while she supported reunification early in the proceeding, her decision not to recommend visitation was based in part on father's incarceration.

Under these circumstances, father has failed to show that counsel's performance was deficient or prejudicial. Accordingly, we reject his claim of ineffective assistance of counsel.

The judgment is affirmed as to father and reversed as to mother, and the case is remanded for further proceedings consistent with this opinion.

Judge ROY and Judge LOEB concur.