24CA0857 Peo in Interest of R-GJM 03-06-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 24CA0857
Mesa County District Court No. 21JV236
Honorable Richard T. Gurley, Judge

---

The People of the State of Colorado,

Appellee,

In the Interest of R-G.J.M., a Child,

and Concerning T.M.,

Appellant.

---

JUDGMENT REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division III
Opinion by JUDGE DUNN
Tow and Graham*, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced March 6, 2025

---

Todd Starr, County Attorney, Brad Junge, Assistant County Attorney, Grand Junction, Colorado, for Appellee

Jenna L. Mazzucca, Guardian Ad Litem

Patrick R. Henson, Office of Respondent Parents' Counsel, Chelsea A. Carr, Office of Respondent Parents' Counsel, Denver, Colorado, for Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2024.

¶ 1    T.M. (mother) appeals the juvenile court's judgment terminating her parent-child legal relationship with R-G.J.M. (the child).  Because we conclude that the Mesa County Department of Human Services did not make active efforts to reunite mother and the child as required by the Indian Child Welfare Act of 1978 (ICWA), 25 U.S.C. §§ 1901-1963, we reverse and remand for further proceedings.

## I.    Background

### A.    Pre-ICWA Period

¶ 2    In November 2021, mother gave birth to the child while incarcerated.  Mother was transferred to the hospital, where she told a caseworker that she was "mentally disabled" and having paranoid delusions.  The juvenile court granted emergency protective custody of the child to the Department.  The Department placed the child in a kinship placement and filed a petition in dependency and neglect.

¶ 3    In March 2022, the court adjudicated the child dependent or neglected.  Meanwhile, the Department learned that mother was an enrolled member of the Chippewa Cree of the Rocky Boy's Reservation (the Tribe).  In response to the Department's inquiry,

1

the Tribe said that the child was neither enrolled in the Tribe nor eligible for enrollment. In April 2022, the court determined the child was not an Indian child under ICWA.

¶ 4 Shortly after, the court adopted a treatment plan for mother. The plan required her to (1) complete a parenting evaluation and follow all recommendations; (2) complete a mental health and substance abuse evaluation and follow all recommendations; (3) submit to random substance screenings; (4) engage in family time with the child and complete a parenting class; (5) maintain safe and stable housing; (6) gain and maintain employment; (7) comply with all terms and conditions of any criminal case or probation; and (8) sign releases of information and maintain contact with case professionals.

¶ 5 Months into the treatment plan, mother stopped participating and stated that she wanted to relinquish her parental rights. After several months with no engagement, the Department filed a motion to terminate parental rights.

### B.   Post-ICWA Period

¶ 6 But in October 2023, at the scheduled termination hearing, mother informed the Department that the child was eligible for

enrollment in the Tribe. Though now having reason to know the child was an Indian child, the Department didn't ask to vacate the termination hearing; instead, at the Department's request, the court continued the termination hearing for two months to December 2023. The court then continued the termination hearing another three months to March 2024, again at the Department's request, so that the Department could arrange for a qualified expert witness to testify. In January 2024, the child became an enrolled member of the Tribe.

¶ 7        In February 2024, the Department filed a motion asking the court to find that, as required by ICWA, it had made active efforts to reunite mother and the child. At the review hearing, mother argued that the Department had not made active efforts because it had not provided in-person family time with the child and had not recommended a parenting class until that month. Additionally, mother, mother's counsel, and mother's guardian ad litem explained that, since October 2023 when there was reason to know the child was an Indian child, mother had been consistently engaging in services, had completed a neuropsychological evaluation, had stable housing and income, was successfully

managing her mental health and substance use, was enrolled in school, was complying with her probation, and was volunteering at a homeless shelter.

¶ 8 In response, the Department didn't dispute mother's recent compliance with these portions of the treatment plan (though the child's guardian ad litem emphasized mother's previous lack of compliance). Instead, though ICWA clearly applied, the Department expressed that "it's unreasonable for anybody to request that we make active efforts" because "for . . . two and a half years [the child] has been out of placement." Even though many months had passed since there was reason to know the child was an Indian child, concerning active efforts, the Department reported that it was "look[ing] into" getting a parenting class authorized for mother "as soon as possible," "discussing about getting [mother] out for visits" to a different county where the child was located, and working "to get information from [mother's] providers since being aware now that [mother] has changed her mind." Deferring its ruling, the court set a six-hour active efforts and review hearing for May 2024.

¶ 9 Yet the March 2024 termination hearing remained scheduled. At that hearing, mother and father appeared, but the judge

assigned to the case (and who set the active efforts hearing) wasn't available, so a different judge presided. At the outset of the hearing, the parties argued about whether, in light of the pending active efforts hearing, the court should continue the termination hearing. The Department asked the court to consolidate the two hearings and proceed with termination. Father's counsel countered that the roughly five months that active efforts "should have been in place" was insufficient to satisfy ICWA. The court proceeded with the termination hearing, granted the Department's motion, and terminated mother's parental rights.[1]

## II. The Department Did Not Make Active Efforts

¶ 10 At the termination hearing, there was no real dispute that mother was managing her mental health and substance use, was compliant with probation, and had stable housing and income. Indeed, the juvenile court acknowledged mother's recent efforts toward her treatment plan. Given mother's compliance with these aspects of her treatment plan, it appears that family time and

---

[1] The juvenile court denied the motion to terminate father's parental rights, finding that the Department had not made active efforts to rehabilitate father and reunify the family.

parenting were the remaining treatment plan areas where mother was lagging.

¶ 11    But citing the case's thirty-month lifespan, mother's previous intent to relinquish her parental rights, her failure to comply with the treatment plan in a reasonable amount of time, and the child's need for permanency, the court generally found beyond a reasonable doubt that "active efforts were made" regarding mother (without identifying any specific efforts that it found satisfied ICWA).

¶ 12    Mother contends that the juvenile court erred by finding that, after ICWA's requirements were triggered in October 2023, the Department made active efforts to reunify the family. On this record, we agree.

A.    Applicable Law and Standard of Review

¶ 13    In non-ICWA cases, an agency must make "reasonable efforts" to rehabilitate the parents and reunite the family. §§ 19-1-103(114), 19-3-100.5(1), 19-3-208, 19-3-604(1)(c), (2)(h), C.R.S. 2024. Reasonable efforts mean the "exercise of diligence and care" to reunify parents with their children. § 19-1-103(114).

Reasonable efforts are satisfied when an agency provides services in accordance with section 19-3-208. § 19-1-103(114).

¶ 14    But ICWA requires that an agency make "active efforts . . . to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family." 25 U.S.C. § 1912(d). Active efforts require "affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with his or her family." 25 C.F.R. § 23.2 (2024). Active efforts are "a more demanding standard than the reasonable efforts standard applied in non-ICWA cases." *People in Interest of My.K.M. v. V.K.L.*, 2022 CO 35, ¶ 31. And though ICWA doesn't outline what an agency must do to satisfy the active efforts standard, federal regulations outline non-exhaustive examples of active efforts:

- conducting "a comprehensive assessment of the circumstances of the Indian child's family, with a focus on safe reunification as the most desirable goal";
- identifying "appropriate services and helping the parents to overcome barriers, including actively assisting the parents in obtaining such services";

- identifying, notifying, and inviting "representatives of the Indian child's Tribe to participate in providing support and services to the Indian child's family and in family team meetings, permanency planning, and resolution of placement issues";

- conducting or causing to be conducted "a diligent search for the Indian child's extended family members, and contacting and consulting with extended family members to provide family structure and support for the Indian child and the Indian child's parents";

- offering and employing "all available and culturally appropriate family preservation strategies and facilitating the use of remedial and rehabilitative services provided by the child's Tribe";

- taking steps to "keep siblings together whenever possible";

- supporting "regular visits with parents or Indian custodians in the most natural setting possible as well as trial home visits of the Indian child during any period of removal, consistent with the need to ensure the health, safety, and welfare of the child";

- identifying "community resources including housing, financial, transportation, mental health, substance abuse, and peer support services and actively assisting the Indian child's parents or, when appropriate, the child's family, in utilizing and accessing those resources";

- monitoring "progress and participation in services";

- considering "alternative ways to address the needs of the Indian child's parents and, where appropriate, the family, if the optimum services do not exist or are not available"; and

- providing "post-reunification services and monitoring."

25 C.F.R. § 23.2; *see also My.K.M.*, ¶ 28. At minimum, active efforts require an agency to identify and secure the resources and services parents need to successfully satisfy court treatment plan objectives and to support the parents through the treatment plan. *My.K.M.*, ¶ 32.

¶ 15 We analyze an agency's active efforts "by considering the totality of the circumstances and accounting for all services and resources provided to a parent to ensure the completion of the entire treatment plan." *Id.* at ¶ 33. In doing so, we measure an agency's efforts "holistically rather than in isolation with respect to

specific treatment plan objectives." *Id.* at ¶ 35. Ultimately, active efforts "should be 'tailored to the facts and circumstances of the case.'" *Id.* at ¶ 32 (quoting 25 C.F.R. § 23.2).

¶ 16　　Whether an agency satisfied ICWA's active efforts requirement is a mixed question of fact and law, meaning we review the juvenile court's factual findings for clear error but review de novo whether those findings satisfy ICWA's active efforts requirement. *Id.* at ¶ 20.

### B.　Family Time

¶ 17　　Relying on 25 C.F.R. § 23.2(7), mother contends that the Department did not make active efforts because it did not support the child's "regular visits with parents . . . in the most natural setting possible as well as trial home visits of the Indian child during any period of removal, consistent with the need to ensure the health, safety, and welfare of the child."

¶ 18　　To the extent mother contends that the services outlined in the regulation are required to satisfy the active efforts standard, we disagree. Rather, the regulation "include[s] a non-exhaustive list of examples illustrating active efforts." *My.K.M.*, ¶ 28.

¶ 19　　But we agree with mother's related contention that the Department "failed to make active efforts to facilitate" in-person

10

family time between her and the child. At the start of the case (and before ICWA applied), mother was incarcerated. Upon her release, she lived in Mesa County. But the Department placed the child with a family that lived many hours away by car — first in Gunnison County and then in Douglas County. No agencies were willing to provide in-person family time supervision between these counties, and "[t]ransportation was an issue." Thus, because in-person visits were "going to take a lot . . . to facilitate" "due to the distance," the Department required mother to consistently attend virtual family time before authorizing an in-person visit. This was so despite the fact that, as one caseworker admitted, the child was an infant and a parent "really can't build a meaningful relationship over virtual" visits "with an infant." Not to mention that the record doesn't contain any evidence regarding safety concerns that would justify the Department's failure to offer mother in-person family time for months after her release from jail. *See People in Interest of E.S.*, 2021 COA 79, ¶ 23 ("[A]bsent health and safety concerns, a juvenile court may not approve a treatment plan that does not provide for face-to-face visitation."); *accord People in Interest of D.G.*, 140 P.3d 299, 302 (Colo. App. 2006).

¶ 20    To be sure, mother struggled to maintain consistent virtual family time visits.  She eventually disengaged from her treatment plan and decided to relinquish her parental rights.  The Department then moved to terminate her parental rights.  Before the scheduled termination hearing, mother had a single in-person visit with the infant child.

¶ 21    We needn't consider, however, whether the Department's efforts up to that point satisfied the reasonable efforts standard because, after learning that the child was eligible for tribal enrollment, ICWA was triggered, and mother decided against relinquishment and expressed motivation to work toward reunification.  From then onward, the Department was required to make active efforts — that is, "affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with his or her family."  25 C.F.R. § 23.2.  That included assisting mother "through the steps of a case plan and with accessing or developing the resources necessary to satisfy the case plan."  *Id.*

¶ 22    Yet the Department's family time services offered after October 2023 were not much different than the services offered before ICWA

applied. To illustrate, in October 2023, the Department referred mother to virtual family time to ensure, again, that she could be consistent before offering in-person visits. Mother missed her intake and her first virtual visit but was generally consistent with family time for approximately two months before the termination hearing. By February 2024, the Department determined that it was in the child's best interest to have an in-person visit (but nevertheless planned to pursue termination the following month). Though mother initially stated she couldn't see the child in person until April 2024 because she wanted to focus on school, she had a second in-person visit a week before the termination hearing in March 2024.

¶ 23 We don't see how the Department's wait-and-see approach concerning in-person visits — which remained unchanged between the periods when ICWA applied and didn't apply — establishes "affirmative, active, thorough, and timely efforts intended" to reunite mother and the child. *Id.*; *see also My.K.M.*, ¶ 31 ("[W]hereas 'reasonable efforts' may include passive efforts, the phrase 'active efforts' denotes something more . . . .").

¶ 24     We recognize that the qualified expert witness opined generally that the Department made active efforts to rehabilitate mother and that the court found active efforts.[2]  But neither the court nor the expert witness identified what those efforts were — especially with respect to facilitating family time — and how they satisfied the Department's active efforts obligation.  *Cf. My.K.M.,* ¶¶ 15, 37-45 (upholding the juvenile court's active efforts determination because the juvenile court "heavily credited" the qualified expert witness, who outlined the extensive efforts made).

¶ 25     Even more than that, the expert witness testified that active efforts would include "making sure [the Indian family] had the transportation" for appointments and "working to facilitate the bond between the parents."  But no evidence was presented that the Department did that once ICWA applied.  Indeed, besides the physical distance between mother and the child, the expert could not explain why the Department had not made efforts to arrange transportation for in-person visits but noted that the Department

---

[2] The qualified expert witness also opined that the Department made active efforts with respect to father, but the juvenile court rejected that opinion.

had — at some unspecified point — given mother "[b]us passes, stuff like that." When asked whether virtual visits "help[ed] the bond" between mother and the child, the expert admitted, "It's better than nothing, but . . . it's hard at that age."

¶ 26 As to facilitating visits, one caseworker testified that she periodically drove out to check on the child. When asked why she couldn't "facilitate a visit when" she went to see the child, she admitted, "I could do it, but as far as driving out there . . . just to do a visitation, that doesn't make much sense."

¶ 27 Thus, even considering the family time services offered throughout the case, the record doesn't demonstrate that the Department made "affirmative, active, thorough, and timely efforts" to facilitate family time once ICWA applied. 25 C.F.R. § 23.2.

## C. Parenting Class

¶ 28 We also agree with mother that the Department did not make active efforts because it did not timely refer her to a parenting class.

¶ 29 Per her treatment plan, mother was required to "attend a parenting class approved by [the Department]." But the Department did not even authorize a parenting class for mother until February 2024 — months after it learned ICWA applied and

one month before the termination hearing. At the termination hearing, one caseworker candidly admitted that, when mother resumed services in October 2023, the caseworker "kind of overlooked the parenting class recommendation." And the qualified expert witness stated that she was unaware the Department had not authorized a parenting class until February 2024 and agreed that the Department's failure to authorize portions of the treatment plan would not satisfy active efforts.

¶ 30     Under these circumstances, we can't conclude that the Department's provision of a parenting class one month before the termination hearing satisfied its obligation to make affirmative, timely, and thorough efforts. *See* 25 C.F.R. § 23.2; *see also My.K.M.*, ¶ 32 (explaining that, at minimum, active efforts require an agency "to identify and secure the resources and services parents need to successfully satisfy court treatment plan objectives and support the parents through the treatment plan goals").

## D.    Reversal Is Required

¶ 31     Without a doubt, the circumstances here are unique. ICWA didn't apply to the case for twenty-three months, mother struggled at the beginning of the case, and she contemplated relinquishment.

But once this became an ICWA case and mother sought to reengage, the Department was required to make active efforts before seeking "termination of parental rights to a Native American child." *My.K.M.*, ¶ 23.

¶ 32     But even after learning that ICWA applied, the Department didn't think it was "reasonable" to engage in active efforts and, without apparent regard to the policies underlying ICWA, seemingly pushed forward to the termination of parental rights. *See id.* at ¶¶ 21-22 (outlining the history and purpose of ICWA). To illustrate, despite the need for active efforts beginning in October 2023, the Department didn't withdraw its motion to terminate parental rights but instead simply asked the court for a two-month continuance of the termination hearing. When the Department again asked to continue the hearing for three more months, it did so not for additional time to support mother and reunite her with the child but because of scheduling conflicts and the continued search for a qualified expert witness to testify at the termination hearing. Given this drive toward termination, we are hard-pressed to conclude that the Department was focused on providing services "that would permit the Indian child to remain or be reunited with [his] parents,

whenever possible." *Id.* at ¶ 26 (explaining Congress's intent when designing the active efforts standard) (citation omitted).

¶ 33     We recognize, of course, that we must review the Department's actions "holistically rather than in isolation with respect to specific treatment plan objectives." *Id.* at ¶ 35.  But no one appears to dispute that, in the five months ICWA governed this case, mother managed to become compliant with most of her treatment plan goals.  That is, she was managing her mental health and substance use, was complying with probation, and had stable housing and income.  In fact, the record indicates that, in those five months, mother accomplished most (if not all) of the progress toward the treatment plan on her own and without assistance from the Department.  Because mother had addressed her other treatment plan components, what was left — and where she required the Department's assistance — was family time and parenting skills.  It's unclear how mother could become fit unless the Department provided these specific active efforts.  After all, mother and the child lived many hours apart by car, and everyone seemed to agree that the virtual visits the Department had provided so far were less than ideal to build a meaningful bond between mother and the child.

¶ 34 To the extent the Department argues that it made active efforts by pointing to other services it offered before ICWA applied (such as "mental health services, a neurological exam, housing applications, life skills worker, bus passes and financial assistance"), it doesn't expand on the timing and nature of these services or otherwise explain how the services were "designed to prevent the breakup of the Indian family." 25 U.S.C. § 1912(d). Likewise, the qualified expert witness didn't provide specific details about any of the Department's services or describe how those services constituted active efforts. Thus, even considering the totality of the circumstances and assessing the Department's efforts holistically, we don't see how the Department made "affirmative, active, thorough, and timely efforts" to reunite mother with the child. 25 C.F.R. § 23.2.

¶ 35 For these reasons, we conclude that the evidence presented didn't support the juvenile court's finding that the Department satisfied the active efforts standard.

### III. Other Contentions

¶ 36 Having so concluded, and because they may not arise on remand, we needn't reach mother's separate contentions that the

juvenile court erred by (1) concluding she was unfit to parent despite substantial compliance with her treatment plan; and (2) terminating her parental rights without finding, as required by ICWA, that "the continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child." 25 U.S.C. § 1912(f); *see also People in Interest of D.B.*, 2017 COA 139, ¶¶ 13-14. On remand, should the case proceed to another termination hearing, the juvenile court should make the findings required by § 1912(f) before it may terminate mother's parental rights. *Cf. People in Interest of R.L.*, 961 P.2d 606, 609 (Colo. App. 1998) (reversing because the juvenile court failed to make the "predicate" termination findings under § 1912(d) & (f)).

## IV.   Disposition

¶ 37   We reverse the judgment and remand for further proceedings.

JUDGE TOW and JUDGE GRAHAM concur.