25CA0716 Peo in Interest of OS 10-02-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 25CA0716
Mesa County District Court No. 24JV6
Honorable Jeremy L. Chaffin, Judge

---

The People of the State of Colorado,

Appellee,

In the Interest of O.S., a Child,

and Concerning M.P. and R.S.,

Appellants.

---

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division VII
Opinion by JUDGE MOULTRIE
Tow and Lum, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced October 2, 2025

---

Todd M. Starr, County Attorney, Brad Junge, Assistant County Attorney, Grand Junction, Colorado, for Appellee

Josie Burt, Guardian Ad Litem

The Morgan Law Office, Kristofr P. Morgan, Colorado Springs, Colorado, for Appellant M.P.

Elizabeth A. McClintock, Office of Respondent Parents' Counsel, Colorado Springs, Colorado, for Appellant R.S.

¶ 1    In this dependency and neglect proceeding, R.S. (father) and M.P. (mother) appeal the juvenile court's judgment terminating their parent-child legal relationships with O.S. (the child).  We affirm the judgment terminating father's parental rights, but we reverse the judgment terminating mother's parental rights and remand the case to the juvenile court for further proceedings consistent with this opinion.

## I.    Background

¶ 2    After the Mesa County Department of Human Services received a referral raising concerns that the child was born "heavily substance exposed," the intake caseworker met with mother who admitted to using methamphetamine the morning of the child's birth.  Father later confirmed he also used controlled substances that morning.  The Department sought, and was granted, temporary emergency custody and filed a petition in dependency or neglect.  The Department initially placed the child in foster care.  Three and a half months later, the Department changed placement to mother's adult son and his wife (kinship placement) where the child remained for the duration of the case.

1

¶ 3 After initial contact with the caseworker, the parents didn't engage in the case for several months. The juvenile court entered a default judgment adjudicating the child dependent or neglected and adopted treatment plans for both parents. The treatment plans required mother and father to (1) attend family time and a parenting class; (2) complete substance abuse and mental health assessments and follow all reasonable recommendations; (3) obtain and maintain safe and stable residences and income sources; (4) complete capacity to parent evaluations and follow all reasonable recommendations; (5) comply with all terms and conditions of any criminal case and/or probation; and (6) engage in timely communication with the Department.

¶ 4 About three months later, mother reengaged in the case. The Department moved to terminate the parents' legal relationships with the child and, shortly thereafter, father began engaging in the case. The juvenile court continued the termination hearing for four months to give father's newly appointed counsel additional time to prepare. Twelve months after the petition was filed, the juvenile court held a two-day hearing and terminated mother's and father's legal relationships with the child.

## II.     Termination Criteria and Standard of Review

¶ 5     A juvenile court may terminate parental rights if it finds, by clear and convincing evidence, that (1) the child has been adjudicated dependent or neglected; (2) the parent hasn't reasonably complied with an appropriate treatment plan or the plan hasn't been successful; (3) the parent is unfit; and (4) the parent's conduct or condition is unlikely to change within a reasonable time. § 19-3-604(1)(c), C.R.S. 2025.

¶ 6     When, as here, a child is under six years old at the time a petition in dependency or neglect is filed, the juvenile court must consider the statutory expedited permanency planning provisions, which require that the child be placed in a permanent home as expeditiously as possible.  §§ 19-1-102(1.6), 19-1-123, 19-3-702(5)(c), C.R.S. 2025; *see People in Interest of S.Z.S.*, 2022 COA 133, ¶ 25.

¶ 7     Whether a juvenile court properly terminated parental rights presents a mixed question of law and fact because it involves application of the termination statute to evidentiary facts.  *People in Interest of L.M.*, 2018 COA 57M, ¶ 17.  We review the court's factual findings for clear error, but we review de novo its legal conclusions

3

based on those facts. *People in Interest of S.R.N.J-S.*, 2020 COA 12, ¶ 10. In particular, we review de novo the juvenile court's ultimate determination of whether the Department satisfied its reasonable efforts obligation. *People in Interest of A.S.L.*, 2022 COA 146, ¶ 8. The credibility of the witnesses; sufficiency, probative value, and weight of the evidence; and the inferences and conclusions drawn therefrom are within the discretion of the juvenile court. *People in Interest of A.M. v. T.M.*, 2021 CO 14, ¶ 15.

### III. Reasonable Efforts

Mother contends that the juvenile court erred by finding that the Department made reasonable efforts to reunify the family. Specifically, she asserts that the Department failed to make reasonable efforts by changing her family time from in-person to virtual without a hearing as required by section 19-3-217(3), C.R.S. 2025. We agree.

### A. Applicable Law

"One of the goals of the Children's Code is to preserve the parent-child relationship whenever possible." *People in Interest of A.A.*, 2020 COA 154, ¶ 5. To that end, before a juvenile court may terminate parental rights under section 19-3-604(1)(c), a

department must make reasonable efforts to rehabilitate the parent and reunify the family. *See* §§ 19-3-100.5(1), 19-3-604(2)(h), C.R.S. 2025; *People in Interest of S.N-V.*, 300 P.3d 911, 915 (Colo. App. 2011). "Reasonable efforts" means the "exercise of diligence and care" for children who are in out-of-home placement. § 19-1-103(114), C.R.S. 2025.

¶ 10 Appropriate services provided in accordance with section 19-3-208, C.R.S. 2025, satisfy the reasonable efforts standard. § 19-1-103(114). As pertinent here, section 19-3-208 requires the department to provide "[f]amily time services for parents with children or youth in out-of-home placement." § 19-3-208(2)(b)(IV). The provision of family time services uniquely impacts the ability of parents and children to successfully reunify. *See* § 19-1-103(64.5) (defining "[f]amily time" as "any form of contact or engagement between parents . . . and children or youth for the purposes of preserving and strengthening family ties").

¶ 11 Questions about family time are entrusted to the juvenile court's sound discretion, and the court may not delegate those decisions to a third party. *People in Interest of D.G.*, 140 P.3d 299, 302 (Colo. App. 2006); *see also People in Interest of B.C.*, 122 P.3d

5

1067, 1071 (Colo. App. 2005) (stating that recommendations as to family time are subject to the continuing supervision and review of the juvenile court, which retains ultimate decision-making responsibility). Under section 19-3-217(3), "[a]bsent the issuance of an emergency order, a parent granted family time is entitled to a hearing prior to an ongoing reduction in, suspension of, or increase in the level of supervision, including a change from in-person family time to virtual family time."

## B.    Analysis

¶ 12    Five weeks after the petition was filed, the juvenile court granted mother two hours of in-person, professionally supervised family time and one additional hour of kin supervised family time "in a community setting" each week. Shortly after mother's first visit with the child, she stopped communicating with the caseworker.

¶ 13    Approximately five months later, the caseworker located mother in a detention center and set up virtual family time. Mother was then released to a treatment facility in the Denver metro area. Pursuant to the facility's policies, mother couldn't have contact with anybody outside the facility during the first thirty days of treatment

(the "blackout period"). But after this period, the facility authorized

day passes allowing mother to leave the facility for up to four hours.

Mother requested in-person family time but, instead, the

Department resumed virtual time, determining it to be in the child's

best interests. The Department didn't request, and the juvenile

court didn't hold, a hearing regarding mother's family time.

Mother's family time remained virtual until the termination hearing.

¶ 14    Because the Department didn't request a hearing as required

by section 19-3-217(3) before changing mother's family time from

in-person to virtual on an ongoing basis, we conclude that the

juvenile court erred by finding that the Department made

reasonable efforts to rehabilitate mother and reunify the family.

¶ 15    The Department and guardian ad litem (GAL) argue that the

juvenile court didn't err because mother's "choices made it

impossible to implement in[-]person family time." True, in-person

family time wasn't possible during mother's incarceration and

treatment facility blackout period. *See* § 19-3-217(4) ("The county

department is not required to produce a child or youth for court-

ordered family time if the family time is made impossible due to the

policies of a facility where the parent is incarcerated or in

treatment."). But once mother earned day passes allowing her to leave the treatment facility, in-person family time was possible. And, therefore, under section 19-3-217(3), mother was entitled to a hearing before an ongoing change from court-ordered in-person family time to virtual family time.

¶ 16    We are similarly unpersuaded by the Department's and GAL's argument that the juvenile court was "well aware" that mother was having virtual family time. At no point before the termination hearing did the juvenile court take testimony or other evidence about the form of family time that was in the child's best interests, enter any findings about the feasibility of in-person family time or whether in-person family time would threaten the child's mental, physical or emotional health, or otherwise modify its order authorizing mother to have in-person family time. *See* § 19-3-217(1), (1.5)(d), (3).

¶ 17    The Department and GAL don't provide any authority explaining how a court simply being on notice of a change from in-person to virtual family time is sufficient to meet the hearing requirement set forth in section 19-3-217(3). And we are unaware of any. Allowing a Department to reduce, suspend, or change the

level of supervision of a parent's family time after making the juvenile court "aware" of the change undermines the clear purpose of section 19-3-217(3). *See B.C.*, 122 P.3d at 1070-71 ("[T]he [Children's] Code requires the trial court itself to make decisions regarding visitation, and it may not delegate this function to third parties.").

¶ 18 This is not to say that in every situation the failure to hold a hearing pursuant to section 19-3-217(3) will constitute a lack of reasonable efforts amounting to reversible error. However, under these circumstances, we conclude that the juvenile court erred by determining that the Department made reasonable efforts.

¶ 19 We also cannot conclude that the error was harmless because in terminating mother's legal relationship with the child, the juvenile court focused on the "lack of meaningful bond between [the child] and [mother]," noting that, other than the one visit shortly after the child's birth, mother hadn't met the child in person. The court acknowledged mother's concerns regarding the Department's efforts to aid in her rehabilitation but found that the Department couldn't "offer what [mother was] unwilling to accept."

9

¶ 20    True, a parent is responsible for using the provided services to obtain the necessary assistance to comply with his or her treatment plan. *People in Interest of J.C.R.*, 259 P.3d 1279, 1285 (Colo. App. 2011). But the record reflects that mother *did* comply with virtual family time. The caseworker testified that mother consistently attended virtual time and interacted appropriately with the child. However, there were limitations with virtual time, especially with a young child, and some of mother's visits only lasted ten minutes due to the child's inability to remain engaged. Even though the caseworker acknowledged that virtual family time was "not sufficient to create a relationship between a parent and a child, especially when that child was an infant," the Department didn't provide any in-person family time — despite the existing court order — once mother was available and willing to participate in it. *See* § 19-3-100.5(1) (declaring that the purpose of reasonable efforts is to "reunify the family whenever appropriate"); *see also* § 19-3-217(1.5)(h) ("The county department and the court shall consider a parent's preferences when determining supervision, location, and timing of family time.").

¶ 21 Instead, the Department continued mother's virtual family time, deciding that was best for the child. But that wasn't a determination for the caseworker or Department to make. *See B.C.*, 122 P.3d at 1071. That was exclusively for the juvenile court to decide following a hearing. *See* § 19-3-217(3).

¶ 22 Given these circumstances, we conclude that the juvenile court erred by concluding that the Department engaged in reasonable efforts to reunify mother and the child.[1] Because that error wasn't harmless, we reverse the portion of the judgment terminating mother's legal relationship with the child.

## IV. Fitness Within a Reasonable Time

¶ 23 Father contends that the juvenile court erred by finding that he couldn't become fit within a reasonable time. We disagree.

## A. Applicable Law

¶ 24 A parent must have a reasonable amount of time to work on a treatment plan before the juvenile court terminates their parental rights. *People in Interest of D.Y.*, 176 P.3d 874, 876 (Colo. App.

---

[1] Because we have concluded that the juvenile court erred with respect to its determination that the Department made reasonable efforts to reunify mother with the child, we need not address mother's other contentions.

11

2007). What constitutes a reasonable time to comply with a treatment plan is necessarily fact specific and may vary from case to case. *Id.* But a reasonable time is not an indefinite time; it must be determined by considering the child's physical, mental, and emotional conditions and needs. *S.Z.S.*, ¶ 25.

¶ 25 In determining whether a parent's conduct or condition is likely to change and whether the parent can become fit within a reasonable time, the juvenile court may consider, among other things, whether any change occurred during the dependency and neglect proceeding, the parent's social history, and the long-term nature of the parent's conduct or condition. *K.D. v. People*, 139 P.3d 695, 700 (Colo. 2006).

### B. Analysis

¶ 26 The juvenile court concluded that father was unlikely to become fit within a reasonable time. In reaching this conclusion, the court found that father (1) hadn't engaged in most of his treatment plan; (2) continued to present substance use concerns; and (3) had only spent about ten hours with the child since his birth. The court also found that the child needed immediate

permanency and that it wasn't in his best interests to delay the case further. These findings are supported by the record.

¶ 27 The intake caseworker described father's "[v]ery minimal" contact at the beginning of the case — explaining that he engaged "for a few days . . . then disappeared." She also testified that, even after father resumed engagement in the case, he missed "numerous" family time sessions, "quite a few" drug tests, and tested positive for methamphetamine a few weeks before the termination hearing. During his testimony, father admitted that, in the three months before the termination hearing, he missed approximately one-third of his family time visits. Ultimately, the permanency caseworker opined that father couldn't become fit within a reasonable time, noting he had been given additional time by the continuance of the first termination hearing and didn't make sufficient progress to show that the child could be safely returned to his care.

¶ 28    Father argues that the juvenile court erred by not considering the changes he made during the case, his social history, or whether his conditions were long-term.[2]  We aren't persuaded.

¶ 29    The court's order demonstrates that it considered the credible testimony and evidence presented, including any evidence of father's treatment progress.  In making its findings, the juvenile court specifically considered father's ability to care for the child's basic needs, his historical involvement in the case, and his partial engagement with his treatment plan objectives before concluding that father was "not likely to become fit within the relatively short period that would be reasonable given the age of this case and [the child's] overriding needs."  Father's argument effectively requires us to reweigh the evidence and substitute our judgment for that of the juvenile court, which we cannot do.  *See S.Z.S.*, ¶ 29 (recognizing

---

[2] To the extent father also argues that the Department's referrals for services were incorrect and untimely and, therefore, that the juvenile court erred by concluding the Department made reasonable efforts, we decline to address it because it was undeveloped.  *See People in Interest of D.B-J.*, 89 P.3d 530, 531 (Colo. App. 2004) (declining to address an appellate argument presented without supporting facts, specific argument, or supporting authorities).

that we may not reweigh the court's resolution of conflicting evidence).

¶ 30    Because the juvenile court's findings are supported by the record, we discern no error.

## V.    Less Drastic Alternatives

¶ 31    Lastly, father contends that the juvenile court erred by finding that there was no less drastic alternative to termination.  We disagree.

### A.    Applicable Law and Standard of Review

¶ 32    Consideration and elimination of less drastic alternatives is implicit in the statutory scheme for termination.  *A.M.*, ¶ 40.  In considering less drastic alternatives, a court must give primary consideration to the child's physical, mental, and emotional conditions and needs.  § 19-3-604(3); *People in Interest of D.B-J.*, 89 P.3d 530, 531 (Colo. App. 2004).  A court may also consider, among other things, (1) whether an ongoing relationship with a parent would be beneficial to the child, *People in Interest of A.R.*, 2012 COA 195M, ¶ 38; (2) whether the child is bonded with the parent, *see People in Interest of N.D.V.*, 224 P.3d 410, 421 (Colo. App. 2009); and (3) whether an allocation of parental responsibilities (APR)

15

provides adequate permanence and stability for the child, *People in Interest of T.E.M.*, 124 P.3d 905, 910 (Colo. App. 2005).

¶ 33    For a less drastic alternative to be viable, it must do more than "adequately" meet the child's needs; rather, it must be in the child's best interests. *A.M.*, ¶ 27. Therefore, if the juvenile court considers a less drastic alternative but finds instead that termination is in the child's best interests, it must reject the less drastic alternative and order termination. *Id.* at ¶ 32.

¶ 34    "We review a juvenile court's less drastic alternatives findings for clear error." *People in Interest of E.W.*, 2022 COA 12, ¶ 34. Thus, when a juvenile court considers less drastic alternatives but instead finds that termination is in the child's best interests, we are bound to affirm the decision so long as the record supports its findings. *People in Interest of B.H.*, 2021 CO 39, ¶ 80.

### B.    Analysis

¶ 35    The juvenile court concluded that there was no less drastic alternative to termination that would serve the child's best interests. Specifically, the court found that a guardianship or APR wouldn't provide the permanency and stability that the child needed. The record supports these findings.

16

¶ 36    The intake caseworker opined that an APR wasn't in the child's best interests because it wouldn't provide the child with the level of stability and permanency that he needed.  In support, she testified that (1) the child appeared anxious and distressed during the monthly case meetings; (2) permanency would be beneficial for the child's brain development; and (3) the child lacked a relationship with father.  *See N.D.V.*, 224 P.3d at 421.  Similarly, both kinship placements agreed that an APR wasn't in the child's best interests, explaining the child's need for stability and routine. *See T.E.M.*, 124 P.3d at 910.

¶ 37    We reject father's argument that, because the kinship placement may have been improperly advised regarding an APR, the juvenile court erred by eliminating an APR as a less drastic alternative.  In finding that there were no less drastic alternatives to termination, the juvenile court didn't mention the placements' unwillingness to accept an APR as a consideration.  Instead, the court focused on the child's need for permanency and stability.  In other words, regardless of the placement's understanding of the legal nuances of an APR or their willingness to accept an APR, the

17

court found, with record support, that an APR wasn't the best option for the child. *See A.M.*, ¶ 32.

¶ 38 Because the record supports the juvenile court's finding that there was no less drastic alternative to termination, we cannot disturb it. *See B.H.*, ¶ 80. Accordingly, we affirm the portion of the judgment terminating father's legal relationship with the child.

## VI.  Disposition

¶ 39 The judgment is affirmed in part and reversed in part, and the case is remanded for further proceedings consistent with this opinion.

JUDGE TOW and JUDGE LUM concur.