25CA1439 Peo in Interest of OG 06-18-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 25CA1439
Archuleta County District Court No. 24JV1
Honorable A. Nathaniel Baca, Judge

---

The People of the State of Colorado,

Appellee,

In the Interest of O.G. and V.G., Children,

and Concerning T.G.,

Appellant,

and

C.C.,

Appellee.

---

JUDGMENT AFFIRMED

Division IV
Opinion by JUDGE BROWN
Freyre and Schutz, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced June 18, 2026

---

Cathleen M. Giovannini, County Attorney, Mark Olguin, Assistant County Attorney, Pagosa Springs, Colorado, for Appellee the People of the State of Colorado

Kristen Tarrin, Guardian Ad Litem

The Morgan Law Office, Kristofr P. Morgan, Colorado Springs, Colorado, for Appellant

Robin Tieman, Office of Respondent Parents' Counsel, Boulder, Colorado, for Appellee C.C.

¶ 1     In this dependency and neglect proceeding, T.G. (father) appeals the judgment allocating parental responsibilities for O.G. and V.G. (the children) between him and C.C. (mother). We affirm.

## I.     Background

¶ 2     The Archuleta County Department of Human Services filed a petition alleging the children were dependent or neglected due to concerns that the parents were using illegal substances. The court adjudicated the children dependent and neglected and adopted treatment plans for the parents.

¶ 3     Later, mother entered and completed an inpatient treatment program near Grand Junction. The children were placed with her at the treatment facility and remained in her care for the duration of the case.

¶ 4     Father also entered an inpatient treatment program near Grand Junction but did not complete it and subsequently struggled to demonstrate sobriety. The Department had concerns about father's sobriety during supervised parenting time sessions.

¶ 5     Mother moved for an allocation of parental responsibilities (APR), and the Department and guardian ad litem supported her proposed APR. Father supported an APR but proposed different

terms for his parenting time. Following a hearing, the court largely adopted mother's proposal. It ordered that father may begin therapeutic parenting time after complying with certain requirements, including drug testing. The court permitted father to transition to unsupervised parenting time upon providing negative drug tests for a year, among other conditions.

## II.  Subject Matter Jurisdiction

¶ 6        Before turning to father's contentions, we address a "statement regarding jurisdiction" in mother's answer brief. She argues that the juvenile court may not have had jurisdiction to enter an APR under the Uniform Child-custody Jurisdiction and Enforcement Act (UCCJEA) because it did not confer with a court in Montana where a child-custody proceeding may have been initiated. We conclude that the court had jurisdiction to enter the APR.

### A.  Standard of Review and Relevant Law

¶ 7        The UCCJEA addresses subject matter jurisdiction, which a party may raise for the first time on appeal. *See People in Interest of B.H.*, 2021 CO 39, ¶ 27. We review de novo whether the juvenile court had subject matter jurisdiction under the UCCJEA. *People in Interest of S.A.G.*, 2021 CO 38, ¶ 21. We defer to a juvenile court's

factual findings informing the determination of jurisdiction unless they are clearly erroneous. *Id.*

¶ 8 "The primary aim of the UCCJEA is to prevent competing and conflicting custody orders by courts in different jurisdictions" and to "avoid jurisdictional competition over child-custody matters in an increasingly mobile society." *People in Interest of M.M.V.*, 2020 COA 94, ¶ 17. To achieve this purpose, the UCCJEA establishes a comprehensive framework that a Colorado court must use to determine whether it may exercise jurisdiction in a child-custody matter or whether it must defer to a court of another state. *Id.*

¶ 9 A court has jurisdiction to make an initial child-custody determination if, as relevant here, that court's state is the home state of the child on the date of the commencement of the proceeding. § 14-13-201(1)(a), C.R.S. 2025. "Home state" is defined as the state in which the child lived with a parent for at least 182 consecutive days immediately before the commencement of the proceeding. § 14-13-102(7)(a), C.R.S. 2025.

¶ 10 A court that makes an initial child-custody determination generally retains exclusive, continuing jurisdiction. § 14-13-202, C.R.S. 2025; *People in Interest of C.L.T.*, 2017 COA 119, ¶ 30. A

3

Colorado court may not modify a child-custody determination made by a court of another state unless it has jurisdiction to make an initial child-custody determination and (1) the court of the other state has determined that it no longer has exclusive, continuing jurisdiction; (2) the court of the other state has determined that the Colorado court would be a more convenient forum; or (3) a court of either state has determined that the child and the parents do not presently reside in the other state. § 14-13-203(1), C.R.S. 2025; *C.L.T.*, ¶ 31.

B.    Additional Background

¶ 11    The family resided in Montana before moving to Colorado. While living in Colorado in April 2023, the parents co-petitioned for an APR, and Archuleta County Case No. 23DR24 (2023 APR case) was opened. *See People v. Sa'ra*, 117 P.3d 51, 56 (Colo. App. 2004) ("A court may take judicial notice of the contents of court records in a related proceeding."). The following month, mother moved to dismiss the case, asserting that she and the children had returned to Montana. Another filing by mother on the same day was labeled on the register of actions as "Montana Fourth Judicial District

4

Missoula County State of Montana" (Montana documents).[1] *See id.* The district court later dismissed the 2023 APR case.

¶ 12 Mother testified at the APR hearing in this case that she and the children moved back to Archuleta County in September 2023. The Department's petition followed in late April 2024.

¶ 13 On the first day of the APR hearing, the county attorney notified the juvenile court of the existence and procedural history of the 2023 APR case and, in doing so, vaguely referenced the Montana documents. But he clarified that both parents' attorneys reported "that there was never a domestic relations case filed in Montana" and that Colorado was the children's home state.

¶ 14 The court inquired of the parents' attorneys. Mother's counsel agreed that Colorado was the children's home state. When the court specifically asked if counsel had any information about

---

[1] Each of the Montana documents has a caption reflecting the "State of Montana" as a plaintiff and an individual with the same name as father as a defendant. They contain titles such as "Plea Agreement" and "Affidavit of Probable Cause." To the extent mother relies on the Montana documents to challenge jurisdiction, they do not indicate that a child-custody case was opened in Montana or that a child-custody determination issued there. *See* § 14-13-102(3), (4), C.R.S. 2025; *People in Interest of C.L.T.*, 2017 COA 119, ¶ 34. The Montana documents clearly involve a criminal proceeding.

whether a domestic relations case had been opened in Montana, mother's counsel responded that mother was "a little uncertain about that." Counsel said that when mother "went back to Montana, something might have been filed in that interim period, but as far as [mother] is concerned, there [was] no order that they're following with regard to custody of the children." Father's counsel represented that, to father's knowledge, there was "no order out of Montana."

¶ 15    The court noted the parties' "representations that there [we]re no orders out of Montana and that there [was] not an open case out of Montana." It found that the family had resided in Colorado for at least six months prior to the filing of the petition. And it concluded that it had jurisdiction to proceed because Colorado was the children's home state.

### C.    Analysis

¶ 16    Mother asserts that the juvenile court may not have had jurisdiction to enter the APR. She specifically states that, based on counsel's representations described above, "it appears that something may have been filed in Montana and there . . . may be orders in Montana that the parents were not following." She

suggests that the court had a duty under the UCCJEA to confer with "the court in Montana once it learned that a custody proceeding had likely been commenced" there.  Mother cites the requirement that a Colorado court must communicate with the court of another state if the Colorado court learns that "a custody proceeding has already been commenced in a court of another state, or that an out-of-state custody order has been entered." *C.L.T.*, ¶ 23 (citing § 14-13-206(2), C.R.S. 2025).  But the juvenile court was not informed that a child-custody proceeding had been opened in Montana or that a child-custody order had been entered there.  *See* § 14-13-102(3) (defining a "child-custody determination"); § 14-13-102(4) (defining a "child-custody proceeding").

¶ 17    When "information provided about previous child custody proceedings or orders" is insufficient to allow a court to determine whether it has jurisdiction to proceed, it may stay the proceedings or require the parties to provide reasonably ascertainable necessary information.  *C.L.T.*, ¶¶ 34-35, 42.  For example, if a party informs the court that they participated in another child-custody proceeding, the court may examine the party under oath to gather

7

additional information. § 14-13-209(1)(a), (3), C.R.S. 2025. And "[o]nly then need the court decide whether it must consult with a court in another state." *C.L.T.*, ¶ 42.

¶ 18    While the court could have investigated further, we conclude that it was not required to do so based on the record before it. *See id.* at ¶ 34. The parties agreed that there was not a prior custody order. While mother seemingly relies on her trial counsel's phrasing, "there [was] no order *that they're following* with regard to custody" (emphasis added), trial counsel did not correct the court when it said that "both" parties represented there were no orders from or open cases in Montana. Moreover, the court found, the record supports, and the parties do not dispute that Colorado was the home state of the children at the time the Department filed its petition. *See* § 14-13-201(1)(a).

¶ 19    Accordingly, we conclude that the juvenile court had subject matter jurisdiction under the UCCJEA. *See id.*; *C.L.T.*, ¶ 23.

### III.    ICWA Compliance

¶ 20    Father asserts that there is insufficient evidence in the record to show that the Department exercised due diligence under Colorado's statute implementing the Indian Child Welfare Act of

1978 (ICWA), 25 U.S.C. §§ 1901-1963.  We see no basis to reverse or remand on the limited record before us.

¶ 21    Father raises this issue with respect to mother's claim of possible Native American heritage through the White Mountain Apache Tribe.  Father never claimed Native American heritage during the case.

¶ 22    ICWA applies when an "Indian child" is the subject of a "child-custody proceeding."  25 C.F.R. § 23.103(a) (2025); *see* 25 U.S.C. § 1903(4) ("'Indian child' means any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe.").  A mere assertion of Indian heritage, without more, is insufficient to give the court reason to know that a child is an Indian child.  *People in Interest of E.A.M. v. D.R.M.*, 2022 CO 42, ¶ 56.  However, under Colorado's ICWA statute in effect at the time of the APR hearing, if a court received information that a child may have Indian heritage, it was required to direct the department to "exercise due diligence in gathering additional information that would assist the court in determining

whether there is reason to know that the child is an Indian child."
*See* § 19-1-126(3), C.R.S. 2024.

¶ 23　A "child custody proceeding" is defined in ICWA as a foster care placement, a proceeding to terminate parental rights, or a preadoptive or adoptive placement. 25 U.S.C. § 1903(1). ICWA also applies to an action that may culminate in one of these outcomes, even if it ultimately does not. *See* 25 C.F.R. § 23.2 (2025). But "ICWA does not apply to . . . [a]n award of custody of the Indian child to one of the parents including, but not limited to, an award in a divorce proceeding . . . ." 25 C.F.R. § 23.103(b)(3) (2025); *see In re Marriage of Stockwell*, 2019 COA 96, ¶ 15; *see also In re M.R.*, 212 Cal. Rptr. 3d 807, 821-22 (Ct. App. 2017) (holding that ICWA's notice requirements "do not apply to a proceeding in which a dependent child is removed from one parent and placed with another"); *In re J.B.*, 100 Cal. Rptr. 3d 679, 682 (Ct. App. 2009) (holding that the definition of "child custody proceeding" under ICWA "does not include a proceeding in which a dependent child is removed from one parent and placed with the other"). Because the court allocated parental responsibilities between the parents, we perceive no error in its conclusion that ICWA does not apply.

10

¶ 24　　But even assuming that the Department was required to engage in due diligence and did not comply with its due diligence obligation, we conclude on this record that any error is harmless.[2] The children — who were in mother's care for most of the case — were ultimately placed with her through the APR. *See In re Alexis H.*, 33 Cal. Rptr. 3d 242, 244-45 (Ct. App. 2005) (any deficiency in a department's compliance with ICWA's notice requirements was harmless when the department did not pursue foster care or adoption and instead recommended "from the beginning" that the children remain with their mother). In addition, notwithstanding her initial claim of heritage, mother stated in her APR motion that "[n]either party has indicated that the Children are members of or eligible for enrollment in any Native American Indian Tribe." *See* 25 U.S.C. § 1903(4). Under these circumstances, the alleged lack of due diligence was harmless, and we need not reverse or remand for further proceedings.

---

[2] While father correctly asserts that there is little information in the record concerning the Department's due diligence efforts, we lack transcripts for multiple hearings.

## IV.   Father's Parenting Time

¶ 25   Father contends that (1) his parenting time was restricted without juvenile court authorization during the case, and (2) the court abused its discretion by entering an "overly burdensome" APR.  We see no basis for reversal.

### A.   Legal Framework and Standard of Review

¶ 26   When allocating parental responsibilities in a dependency or neglect proceeding, a juvenile court must consider the legislative purposes of the Children's Code under section 19-1-102, C.R.S. 2025.  *People in Interest of J.G.*, 2021 COA 47, ¶ 18.  The overriding purpose of the Children's Code is to protect a child's welfare and safety by providing procedures through which the child's best interests can be served.  *Id.* at ¶ 19.  Thus, if a court allocates parental responsibilities, it must do so in accordance with the child's best interests, *People in Interest of L.B.*, 254 P.3d 1203, 1208 (Colo. App. 2011); *see* § 19-3-507(1)(a), C.R.S. 2025, and must focus on the protection and safety of the child, *People in Interest of H.K.W.*, 2017 COA 70, ¶ 13.

¶ 27   The allocation of parental responsibilities is a matter within the juvenile court's discretion.  *See In re Parental Responsibilities*

*Concerning B.R.D.*, 2012 COA 63, ¶ 15. A court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair, or when it misapplies or misconstrues the law. *People in Interest of E.B.*, 2022 CO 55, ¶ 14. When the court's findings have record support, its resolution of conflicting evidence is binding on review. *B.R.D.*, ¶ 15.

### B. Additional Background Regarding Father's Parenting Time

¶ 28 Around October 2024, father began an inpatient treatment program near Grand Junction and remained in the geographic area after leaving treatment. In December, the Department referred father to a private agency for supervised parenting time. Although sessions had been scheduled, the agency never supervised any. Father did not comply with the agency's policy requiring drug tests in instances of safety concerns and was discharged from services due to "aggressive behavior" in February 2025.

¶ 29 Father moved for an order regarding parenting time. In the motion, he argued that the Department had failed to encourage maximum parenting time and limited his parenting time as a sanction for not providing drug tests when requested. *See* § 19-3-217(1.5), C.R.S. 2025 (listing considerations for the juvenile

court when deciding temporary parenting time, including that a department shall encourage the maximum parent and child contact possible and shall not limit parenting time as a sanction for noncompliance with court orders if the child's safety or health is not at risk as a result of parenting time).

¶ 30 After father's discharge from the private agency, the Department supervised his parenting time. The caseworker testified that the Department had "recommended" or "requested" he take drug tests prior to visits it supervised. Even so, when the caseworker was asked whether the Department had canceled parenting time due to father's refusal to provide a drug test before a session, she testified, "No, they were canceled when we were concerned for the children's safety and the erratic behaviors" father demonstrated. By the time of the APR hearing in April 2025, the Department had supervised three parenting time sessions, and it had concerns about father's sobriety and unpredictability during all three sessions. The caseworker also testified that father either arrived "an hour late, or he [did not] arrive at all" to family time sessions and that the impact of his tardiness on the children "increased" throughout the case.

## C. The Juvenile Court's APR Ruling

¶ 31    The juvenile court found, in relevant part, as follows:

- Father regularly used methamphetamine and had not demonstrated sobriety for approximately eighteen months.

- Father regularly appeared to be under the influence, including during parenting time.

- Father's mental state had devolved due to substance use.

- Father engaged in domestic violence against mother.

- Father was not a fit parent.

¶ 32    The court also found that, when father was regularly using drugs, he could quickly become a "dangerous and aggressive individual," which the children had witnessed. The court was "very" concerned that the children would be "[in grave] physical danger" in such instances, which would cause a "substantial impact on their emotional development."

¶ 33    The record amply supports the court's findings. Father tested positive for methamphetamine on all his drug tests in 2025, and mother testified that his last period of demonstrable sobriety was during the fall of 2023. His most recent drug test showed that his use had escalated, which "align[ed]" with the Department's

15

concerns about his behaviors. According to the caseworker, father appeared to be shaking and was flushed and sweaty at visits. She described that he had a "smell," dilated eyes, and a flat affect, and that he "verbalized . . . rage."

¶ 34 Mother testified that when father was under the influence, his aggression "escalate[d] very fast" and his behavior was "completely unmanageable." She described an incident during the case that preceded her request for a civil protection order, which was granted. During that incident, father came to the home, contrary to a safety plan in effect at the time, and acted "aggressive[ly]," "kicked in [her] door," "slashed [her] tire," used "threatening language," and behaved in a manner that made him appear to be under the influence. Father entered the home "in the middle of the night" and was "pretty angry," so mother "threw a blanket over [the children's] head[s]" and drove them to her landlord's cabin. Mother and the caseworker testified that they believed father had violated the protection order.

¶ 35 Based on the evidence, the court entered an APR requiring father to take random drug tests for thirty days and, after that period, a hair follicle drug test. If the hair follicle test showed no

drug use (including legal substances), and father had not violated any protection orders in effect, he could begin therapeutic parenting time. Before advancing to unsupervised parenting time, father had to (1) provide negative drug tests for one year; (2) attend all therapeutic parenting time sessions, unless he had an "appropriate" excuse; (3) comply with all protection orders in effect; (4) substantially engage in substance-use and domestic-violence treatment; and (5) engage in a capacity-to-parent evaluation.

### D. Father's Restriction Contention

¶ 36 Father contends that the Department restricted his parenting time in violation of section 19-3-217 by canceling sessions when he refused to take drug tests without a hearing or findings by the juvenile court justifying the restriction. We are not persuaded.

¶ 37 The juvenile court may only restrict or deny parenting time if it is necessary to protect the child's safety or mental, emotional, or physical health. § 19-3-217(1.5)(d). Absent an emergency order, a parent is entitled to a hearing prior to an "ongoing reduction in, suspension of, or increase in the level of supervision" of parenting time. § 19-3-217(3).

17

¶ 38    Father has failed to demonstrate that the Department restricted his parenting time by canceling certain scheduled visits. Rather, it was undisputed that the Department canceled some of father's scheduled sessions when it had concerns about the children's safety and father's erratic behaviors. *See* § 19-3-217(3) (nothing in the statute prevents a department from canceling scheduled parenting time if a child's "safety or mental, emotional, or physical health would be endangered"); *see also People in Interest of A.A.*, 2020 COA 154, ¶ 17 ("Visitation services shall be designed to promote the health, safety, and well-being of the children . . . ."). As noted, father regularly used methamphetamine and appeared to be under the influence during parenting time. And the children had previously witnessed "aggressive" behaviors by father, which occurred while he appeared to be under the influence.

¶ 39    Father also relies on the fact that the Department recommended that his parenting time be changed from supervised to therapeutic in April 2025, without a hearing on the issue. *See* § 19-3-217(3). True, a single scheduled visit did not occur due to the new recommendation. But that visit was scheduled to take place a few days before the APR hearing — after which the juvenile

18

court adopted the recommendation. With the exception of that one visit, father was afforded the hearing required by section 19-3-217(3). Thus, we conclude that any error was harmless. *See* C.A.R. 35(c) ("The appellate court may disregard any error or defect not affecting the substantial rights of the parties.").

¶ 40　　Father also points out that he (1) only had three in-person visits between October 2024 and the APR hearing in April 2025; and (2) requested visits in his parenting time motion, which the court never ruled on. To the extent father argues that he was deprived of the opportunity to show that he could safely exercise parenting time due to the limited number of in-person visits he had, the available record shows he had ample chances to do so. With respect to his motion, the record shows that the Department provided him parenting time sessions after it was filed because it "safety planned" around his behaviors.[3]

¶ 41　　In any case, father does not develop an improper restriction argument based on the number of visits during this period, nor

---

[3] To the extent father contends that the juvenile court erred by not ruling on the motion, we conclude that any error was harmless in light of the APR ruling and the record as a whole. *See* C.A.R. 35(c).

does he provide us with all the transcripts relevant to this issue. *See* C.A.R. 10(d); *see also People in Interest of D.B-J.*, 89 P.3d 530, 531 (Colo. App. 2004) (declining to address an issue where a party did not "make specific arguments" in support of it). Thus, we do not address it further.

### E. Father's APR Contention

¶ 42 Father contends that the juvenile court "effectively ended his parental role through the overly burdensome APR." We are not persuaded.

¶ 43 The court allocated father parental rights — it did not terminate them or his parental role. *See People in Interest of H.L.B.*, 2025 COA 86, ¶ 19 (identifying less drastic alternatives to termination of parental rights, which include an APR) (*cert. granted* Feb. 2, 2026); *see also* § 19-3-608(1), C.R.S. 2025 (providing that a termination judgment divests the parent of "all legal rights, powers, privileges, immunities, duties, and obligations" with respect to the child). Under the APR, father was entitled to family time through the phased-in parenting time plan, provided he adhered to the plan's requirements. Thus, his parental rights were not terminated.

¶ 44    Nor were the terms of the APR "overly burdensome." The conditions related to his parenting time were tailored to the court's concerns about his lack of sobriety during the case, including during his parenting time. The court adopted the hair follicle requirement because it had not seen the consistency from father that was necessary for the children's well-being. It reasoned that, without father showing consistent sobriety, parenting time with him would not be in the children's best interests. These conditions properly focused on the children's safety, emphasizing their need for a "safe environment" going forward. *See H.K.W.*, ¶ 13. Thus, we conclude that the court did not abuse its discretion in allocating parenting time or prescribing requirements father must follow to ensure the children's safety.

¶ 45    Last, father asserts that the "overly burdensome" APR infringed on his fundamental right to parent. But we have rejected the underlying premise of his argument, so we necessarily reject his related constitutional claim.

## V.    Disposition

¶ 46    The judgment is affirmed.

JUDGE FREYRE and JUDGE SCHUTZ concur.

21